UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CAONABO VARGAS,                                   :

            Petitioner,                            :
                                                                    05 Cr. 1327   (VM)
                                                   :                10 Civ. 2933 (GWG)

                      -v.-                         :                <u>OPINION AND ORDER</u>

UNITED STATES OF AMERICA,                          :

            Respondent.                            :
----------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

            Caonabo Vargas was convicted by a federal jury of conspiracy to commit Hobbs Act

robberies in violation of 18 U.S.C. § 1951, and conspiracy to distribute cocaine, heroin, and

marijuana, in violation of 21 U.S.C. § 846.  He was sentenced to a prison term of 151 months on

January 11, 2008.  The United States Court of Appeals for the Second Circuit affirmed the

judgment of conviction on December 17, 2008.  Vargas, who is currently in prison serving his

sentence, has petitioned this Court pro se pursuant to 28 U.S.C. § 2255 to vacate, set aside, or

correct his sentence.  The parties have consented to disposition of this matter by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons below, the Court will schedule

an evidentiary hearing limited to the issue of whether Vargas received effective assistance of

counsel as to advice he was given with respect to any plea offers made by the Government.

Vargas will also be appointed counsel for this purpose.   The remaining issues raised by Vargas,

however, do not require an evidentiary hearing as they have no merit.

I.      BACKGROUND

A.      Pretrial Procedural History

In December 2005, Vargas and his co-defendants Jose Ortiz, Caonabo Valdez, Ricardo

Cruz, Socrates Vizcaino, Sergio Acuna, Angel Diaz, and Nairobi Rosado, were charged in a

three-count indictment.  See Sealed Indictment, filed Dec. 27, 2005 (Docket # 1 in 05 Cr. 1327)

(unsealed on January 19, 2006).  Vargas was charged in all three counts.  Count One alleged that

between December 2000 and January 2, 2001, Vargas participated in a conspiracy to commit

robbery.  Id. ¶ 1.  Count Two alleged that on January 2, 2001, Vargas robbed two individuals in

the vicinity of Gleason Avenue in the Bronx, New York.  Id. ¶ 3.  Count Three alleged that

Vargas used, carried or brandished a firearm (or aided and abetted the same) in relation to the

crimes charged in Counts One and Two.  Id. ¶ 4.

Vargas made an initial appearance and was arraigned on January 19, 2006, where he was

represented by retained attorney Telesforo Del Valle.  See Docket Entry, dated Jan. 19, 2006 (05

Cr. 1327).  On March 28, 2006, James Michael Roth filed a notice of appearance on behalf of

Vargas.  See Notice of Attorney Appearance, filed Mar. 28, 2006 (Docket # 23).  A notice of

substitution of counsel was filed on June 6, 2006, indicating that Vargas would no longer be

represented by Roth and would instead be represented by Del Valle and Martin Schmukler.  See

Notice of Substitution, filed June 6, 2006 (Docket # 36).  Schmukler filed his notice of

appearance the same day.  See Notice of Appearance, filed June 6, 2010 (Docket # 37).

By Order dated December 1, 2006, the court set a trial date of January 22, 2007.  At some

point in December 2006, see Transcript of Proceedings Held Before Hon. Victor Marrero, filed

Feb. 28, 2010 (Docket # 63 in 05 Cr. 1327) ("H. Tr.") at 7, the Government proposed a plea deal

to Vargas.  Vargas contends that the Government made a "5-year plea offer."  See Motion to

2

Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, filed Apr. 6, 2010 (Docket

# 1 in 10 Civ. 2933) ("Pet. Motion") at 4.  The Government has denied this and instead contends

that Vargas was offered "the possibility of a plea to a somewhat longer sentence, albeit one

shorter than the 151 month sentence Vargas ultimately received."  See Memorandum of Law in

Opposition to Vargas's March 14, 2011 Reply Brief in Support of His § 2255 Petition, filed Apr.

19, 2011 (Docket # 24 in 10 Civ. 2933) ("Gov. Sur-Reply") at 2 n.2.

On January 8, 2007, the Government filed a superseding indictment, which added a

fourth count against Vargas alleging that Vargas conspired to distribute and posses with intent to

distribute controlled substances.  See Indictment, filed Jan. 8, 2007 (Docket # 54 in 05 Cr. 1327).

Vargas was arraigned on the superseding indictment on January 11, 2007.  (See H. Tr. at 3).

Both Schmukler and Del Valle were present.  At the conference, the parties discussed the

December 2006 plea offer that had been proposed by the Government.  Schmukler made the

following statements regarding the Government's offer:

> [A]pproximately five or six weeks ago Ms. Loughnane and I had a very frank
> discussion about potential disposition. . . .  And I listened to what perhaps in other
> circumstances might have been a very tempting offer.  But in the end, after
> talking with my client we made a claim that we still intended to proceed to trial
> on the 22nd.

(H. Tr. at 7).

B.    Evidence at Trial

Judge Victor Marrero presided over Vargas's trial, which took place in March and April

2007.  See Trial Transcripts, filed Apr. 27, 2007 (Docket ## 91-93 in 05 Cr. 1327).  Over the

course of the 18-day trial, the Government introduced evidence regarding Vargas's participation

in the charged crimes in the form of testimony from four cooperating witnesses, Jose Stepan,

Ramon Solis, Maximo Guillen, and Socrates Vizcaino, and a confidential informant, Ingrid

3

Negron; translations of recorded conversations between Negron and Vargas; and physical evidence.

The evidence showed that from at least 1997, Vargas operated a real estate office in the Bronx.  (See Stepan: Tr. 759; Solis: Tr. 822-23).  From this office, Vargas rented apartments to some  individuals whom he knew to be involved in robberies and drug dealing.  (See Stepan: Tr. 763, 806, 808; Solis: Tr. 822, 827).  As a result of this work, Vargas was privy to the personal information and addresses of various drug dealers and robbers.  (See, e.g., Stepan: Tr. 767).  Generally, robbers and drug dealers refrain from disclosing this information because their failure to keep this information secret may result in the dealer or robber falling subject to a robbery themselves (see, e.g., Stepan: Tr. 800-01, 808).  Vargas used this information to act as a "santero" for a group of men who made their living robbing drug dealers.  (Stepan: Tr. 748, 759-61, 793).  As a "santero," Vargas would provide these men with the addressees of the drug dealers, the place where the drugs were located in the house, and the location of the house.  (See Stepan: Tr. 748, 800-01).  In addition, the "santero" would verify that drugs or money were within the house.  (See Stepan: Tr. 749).  In exchange for this information, Vargas received a "good part" of the proceeds of any robbery.  Id.

Vargas provided Stepan and his partner "Rubio" with the address and the "specific information of an apartment [in the Bronx where] some people who were bringing drugs to the [United States were residing]."  (See Stepan: Tr. 761).  Vargas took Stepan and Rubio to the apartment and told them where the drugs were "so [they] could steal them."  Id.  Specifically, Vargas told Stepan that the drugs were located in a "trap, . . . a secret compartment that drug dealers use to stash their drugs so the police cannot find [them]."  (Stepan: Tr. 763-64).  After receiving this information, Stepan, Rubio, and others committed the robbery, and found

4

approximately one thousand pounds of marijuana in the location that Vargas had described.

(Stepan: Tr. 765).  The marijuana was distributed amongst the "participa[nts] in the robbery" and

a portion was given to Vargas.  (Stepan: Tr. 766).

Vargas also provided Stepan with information about a potential robbery in New Jersey

involving "300 kilos" of drugs.  (See Stepan: Tr. 771).  Vargas told Stepan "that he knew some

Mexicans" who had left a van containing 300 kilos of drugs illegally parked in New Jersey.  Id.

The sheriff had towed and taken away the van and that drugs were still located within the van,

hidden under fruit and produce.  See id.  Upon hearing this information, two members of

Stepan's crew went to New Jersey to "check[] . . . out" the location of the potential robbery.  Id.

After learning that the van was parked in a location where there were cameras, Stepan decided

not to commit the robbery.  (See Stepan: Tr. 772-73).

Solis also utilized Vargas's services as a santero.  (See Solis: Tr. 827-28, 903-04, 907-

08).  In 1999, Solis met with Vargas to discuss a potential "job" on Gun Hill Road in the Bronx.

(Solis: Tr. 903).  Vargas took Solis and others to the Gun Hill Road house and told them that the

persons residing there were stashing "a load" of cocaine.  (Solis: Tr. 903-04).  After learning that

Vargas had never actually seen the drugs, Solis and his crew decided not to commit the robbery.

(Solis: Tr. 904).  Vargas and Solis discussed two additional potential robberies.  Sometime in

2000 or 2001, Solis met with Vargas and his "woman" Evelyn at Vargas's office in the Bronx.

(Solis: Tr. 906).  The three discussed a potential "jewelry job," which Solis rejected because "[he

did not] steal jewelry."  (Solis: Tr. 906-07).  In the summer of 2001, Solis discussed another

potential job "in the area . . . [of] 180th [Street]."  (Solis: Tr. 907).  Vargas told Solis that he

"had rented [an apartment] to some Mexicans who came from Mexico with a load [of cocaine]"

and that he "had the trap built where the [Mexicans] were going to put the drugs."  (Solis: Tr.

5

907-08).  Vargas took Solis to the house, showed him the key to the building, and told Solis that

he would contact him after he had spoken to the Mexicans.  (Solis: Tr. 909).  Solis never

discussed the job with Vargas again and Solis did not commit the robbery.  (Solis: Tr. 909-10).

    In addition to conspiring to commit robberies, Vargas also conspired with others to

distribute drugs, including those that were stolen in robberies.  (Stepan: Tr. 766-67, 770-71, 773-

74).  Stepan testified that he had provided Vargas marijuana as payment for his services as a

santero (Stepan: Tr. 766-67) and he had given Vargas 20 kilograms of cocaine to distribute for a

drug dealer named "El Fuerte" (see Stepan: Tr. 773).  Additionally, Vargas boasted about his

sales of both heroin and cocaine during a phone conversation with Negron, which Negron had

recorded unbeknownst to Vargas.  Portions of a translated version of the transcript of this

conversation were read to jury.  (Tr. 1188).  During the conversation, Negron asked Vargas

whether he could obtain heroin for Negron's boyfriend to sell.  See Memorandum of Law in

Opposition to Vargas's Motion to Vacate, Set Aside, or Correct Sentence, filed Mar. 25, 2011

(Docket # 21 in 10 Civ. 2933) ("Gov. Mem.") at 6.  Vargas replied "'[d]on't worry, I'm gonna

help you guys.  You guys are gonna make some real good big bucks, both of you are . . . ."  Id. at

6.

    Evidence was also presented regarding other services that Vargas provided to various

robbers and drug dealers.  For a fee, Vargas would put the apartments he rented to robbers

"under a specific name" and would take care of setting up the electricity, gas, and telephone

under the same name.  (Stepan: Tr. 762-63; see Solis: Tr. 822-27).  In addition, Vargas procured

false identification documents for Solis (see Solis: Tr. 837, 923-27) and helped to secure bail for

a robber named Chi Chi, in exchange for a million dollars (see Stepan: Tr. 775-76).

    Vargas testified on his own behalf at trial.  He stated that he was the owner of Gleason

6

Realty, a small real estate business located in the Bronx, and that in that capacity he would rent and sell real estate.  (C. Vargas: Tr. 1402-05).  Vargas later admitted on cross that he was not a licensed real estate broker or agent (see C. Vargas: Tr. 1485) and that his business mainly consisted of "interviewing [persons] who were seeking apartments" (C. Vargas: Tr. 1491), and then "provid[ing] the information to landlords about potential renters and buyers" (C. Vargas: Tr. 1492).  Vargas testified that he did not verify the information provided to him in these interviews.  (See C. Vargas: Tr. 1492-94).

Vargas denied the allegations of the superseding indictment (see C. Vargas: Tr. 1378-89, 1481) and claimed to have had only legitimate, non-criminal contacts with the cooperating witnesses (C. Vargas: Tr. 1437-38, 1444).  Vargas admitted that he had met Stepan and Solis, but testified that he had not assisted either of them in committing any robberies.  (See C. Vargas: Tr. 1437-38, 1447-48, 1481).  Instead, Vargas said he met the two at Gleason Realty when he assisted each in locating apartments.  Vargas testified that he had met Stepan only once, when he and his girlfriend came to Gleason Realty looking for an apartment to rent (C. Vargas: Tr. 1437-38), and that he had met Solis and had rented him two apartments (see C. Vargas: Tr. 1444-48).  Vargas also discussed his relationship with Negron.  Vargas explained that he had met Negron when she came to his office "to apply for an apartment."  (C. Vargas: Tr. 1470).  He stated that the two had dated (see C. Vargas: Tr. 1473) and had a romantic and physical relationship (C. Vargas: Tr. 1474-76).  At no time was Vargas aware that Negron was working with law enforcement.  (C. Vargas: Tr. 1476).  With respect to the tape recording of their phone conversation, Vargas admitted that it was his voice on the tape recording (C. Vargas: Tr. 1476-77), but stated that the statements he made regarding illegal activity and drugs were made only to "impress" Negron, who was trying to get Vargas to buy drugs (C. Vargas: Tr. 1478, 1482).

7

Vargas maintained that he had never procured, bought, or stored drugs.  (C. Vargas: Tr. 1481).

Vargas testified that he had not assisted in any robberies.  (C. Vargas: Tr. 1481).  On cross-examination, Vargas was asked about the robbery of a group of Mexican drug dealers who were living in a small house rented by Gleason Realty – a robbery that Vargas had offered to Solis.  (See C. Vargas: Tr. 1498).  Vargas initially testified that he was not aware of the robbery. (C. Vargas: Tr. 1498).  After further examination, however, Vargas admitted not only that he knew about the robbery, but also that he had taken the group of Mexicans to the hospital because they had sustained injuries during the robbery.  (C. Vargas: Tr. 1499-1501).

The defense called two other witnesses to testify on Vargas's behalf.  Orlando Vargas, Vargas's cousin, whose real estate company had worked with Gleason Realty (O. Vargas: Tr. 1429-32), testified that Vargas was a "very honest," "very professional" person (O. Vargas: Tr. 1430-31).  Additionally, Orlando testified that none of the properties that were shared by the two agencies was ever robbed.  (O. Vargas: Tr. 1434-35).  Similarly, Victor Delgadillo, a customer of Vargas's real estate business, testified that Vargas was a "kind[,] honorable, [and] respectable person" who helped out all of his friends.  (Delgadillo: Tr. 1416).  Delgadillo, who utilized Gleason Realty to secure tenants for his property, testified that none of his tenants was ever robbed.  (Delgadillo: Tr. 1421).

C.    The Jury Verdict and Sentencing

On April 13, 2007, the jury returned a verdict finding Vargas guilty of conspiracy to commit robbery and guilty of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana (Tr. 1873-75).  In addition, the jury concluded that "it was known or reasonably foreseeable to [Vargas] that the [drug] conspiracy would involve the distribution, or possession with intent to distribute" heroin, 5 or more kilograms of cocaine, and 1,000 or

8

more kilograms of marijuana.  (Tr. 1875-76).  The jury acquitted Vargas of the substantive

robbery count and the firearm count. (Tr. 1874-75).

     Sentencing was held before Judge Marrero on January 11, 2008.  Judge Marrero adopted

the factual recitation in the pre-sentence investigation report except the finding that ecstasy was

an object of the drug conspiracy, which the court believed had not been supported by evidence

sufficient to meet the preponderance-of-the-evidence standard.  See Sentencing Transcript, filed

Sept. 9, 2011 (Docket # 240 in 05 Cr. 1327) ("S. Tr.") at 11-12.  The court found that Vargas's

offense level was 34 and his criminal history category was in category one. (S. Tr. 12).  It noted

that the guidelines "recommend a range of imprisonment for this offense level and criminal

history category of 151 to 188 months." Id.  Vargas was sentenced principally to 151 months

imprisonment followed by a period of five years supervised release.  (S. Tr. 13).  The judgment

of conviction was entered on January 18, 2008.  See Judgment in a Criminal Case, filed Jan. 18,

2008 (Docket # 131 in 05 Cr. 1327).

     D.    Direct Appeal

     On January 31, 2008, Vargas appealed his conviction, see Notice of Appeal, filed

January 31, 2008 (Docket # 134 in 05 Cr. 1327), arguing (1) that the district court erroneously

instructed the jury to presume an effect on interstate commerce if the jury found that the object

of the Hobbs Act robbery was illegal drugs or the proceeds of the sale of illegal drugs, and (2)

that the district court erred in admitting the transcript of the recorded conversation between

Vargas and Negron.  See United States v. Vargas, 306 F. App'x 623 (2d Cir. 2008).  On

December 17, 2008, the Second Circuit rejected both arguments and affirmed Vargas's

conviction.  See id.  While the court concluded that the district court erred in instructing the jury

that it could presume an effect on interstate commerce, the court declined to reverse Vargas's

conviction because the court found that the effect of the error was uncertain, indeterminate, or

only speculative, and thus did not affect Vargas's substantial rights.  See id. at 624.  In addition,

the court determined that the district court had properly admitted the recordings because

"Vargas'[s] general statements on drug dealing [bore] directly on the drug conspiracy charged in

the Indictment and on Vargas'[s] testimony at trial that he had never sold drugs."  Id. at 265.

> E.     The Instant Motion

The instant petition is dated March 15, 2010, and was received by the Pro Se Office on

March 18, 2010.  See Pet. Motion.  Vargas seeks relief primarily on the basis of ineffective

assistance of counsel.  Vargas claims that his trial counsel, Martin Schmukler, was ineffective

for the following reasons: (1) counsel failed to convey the government's plea offer and

misadvised him about his sentencing exposure, the risks of going to trial, and the burden of proof

required for a conspiracy conviction; (2) counsel failed to investigate eyewitnesses, failed to

interview eyewitnesses, and failed to present exculpatory eyewitness testimony; (3) counsel

conducted ineffective cross-examinations of two witnesses and failed to use readily available

information to rebut the Government's evidence; (4) counsel failed to adequately prepare Vargas

to testify at trial; (5) counsel allowed Vargas to receive a sentence greater than authorized by the

jury's verdict; (6) counsel failed to appeal his sentence, the trial court's application of the

sentencing guidelines, and the violation of petitioner's constitutional rights; and (7) counsel

failed to exclude evidence related to witnesses Negron and Officer Billy Ralat,[1] and (8) counsel's

---

[1]   While Vargas's motion papers caption this argument as a "fifth amendment due
process violation," see Pet. Motion at 13, the section following the caption discusses only
defense counsel's failure to exclude the testimony of Ralat and Negron.  As a result, we construe
this argument as a claim of ineffective assistance of trial counsel and not as a claim that the trial
court violated Vargas's Fifth Amendment due process rights.

cumulative errors constituted ineffective assistance of counsel.  In addition, Vargas contends that

the "trial court denied [him] a fair sentencing proceeding, in violation of the Due Process Clause

of the Fifth Amendment and the jury-trial guarantee of the Sixth Amendment, by calculating and

imposing petitioner's sentence in the absence of findings beyond a reasonable doubt."  Pet.

Motion at 16-17.  On July 17, 2010, Vargas filed a subsequent motion seeking leave of the Court

to "supplement and interact an additional issue."  See Petitioner[']s Motion for Leave of Court to

Supplement and Interact an Additional Issue, filed July 21, 2010 (Docket # 221 in 05 Cr. 1327)

("Sup. Motion").  In this supplemental memorandum, Vargas asserts an additional claim for

ineffective assistance of counsel based on counsel's failure to object to and appeal the trial

court's decision to lock the courtroom during the jury charge.  See Caonabo Vargas

Memorandum of Law and Supplement to Interact an Additional Issue to his § 2255 Motion

(annexed to Sup. Motion) ("Sup. Mtn. Mem.") at 1-5.

    The Government filed its opposition papers on March 25, 2011.  See Gov. Memo.  On or

about March 14, 2011, Vargas submitted a reply to which he attached new factual materials that

had not been previously submitted with his original motion papers.  See Response to

Government's Memorandum of Law in Opposition to 2255 Motion, dated Mar. 9, 2011 (Docket

# 231 in 05 Cr. 1327; Docket # 18 in 10 Civ. 2933) ("Pet. Reply").  In an Order dated March 18,

2011, the Court granted the Government permission to submit a sur-reply addressing "any new

matters contained" in Vargas's reply papers.  See Order, filed Mar. 18, 2011 (Docket # 232 in 05

Cr. 1327; Docket # 20 in 10 Civ. 2933).  In a Memorandum Endorsement dated April 7, 2011,

this Court granted petitioner's request to file a sur-sur-reply to any sur-reply filed by the

Government.  See Endorsed Letter, filed Apr. 7, 2011 (Docket # 234 in 05 Cr. 1327; Docket # 23

in 10 Civ. 2933).  The Government's sur-reply was filed on April 19, 2011, see Gov. Sur-Reply,

and Vargas's sur-sur-reply was filed on May 23, 2011, see Reply to Government's

Memorandum of Law in Opposition to Vargas' March 14, 2011 Reply Brief in Support of His

§ 2255 Petition, filed May 23, 2011 (Docket # 236 in 05 Cr. 1327; Docket # 25 in 10 Civ. 2933).

II.       APPLICABLE LEGAL PRINCIPLES

     A.       Law Governing Petitions Under 28 U.S.C. § 2255

28 U.S.C. § 2255(a) provides:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed
> in violation of the Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the sentence was in excess of
> the maximum authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside or correct the
> sentence.

Id.  Relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the

sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently

results in [a] complete miscarriage of justice."  Graziano v. United States, 83 F.3d 587, 590 (2d

Cir. 1996) (per curiam) (internal quotation marks and citation omitted).  "Because collateral

challenges are in tension with society's strong interest in the finality of criminal convictions, the

courts have established rules that make it more difficult for a defendant to upset a conviction by

collateral, as opposed to direct, attack."  Yick Man Mui v. United States, 614 F.3d 50, 53 (2d

Cir. 2010) (internal quotation marks and citations omitted).

     In considering a § 2255 petition, "[u]nless the motion and the files and records of the

case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt

hearing thereon, determine the issues and make findings of fact and conclusions of law with

respect thereto."  28 U.S.C. § 2255.  The Second Circuit has interpreted section 2255 "as

requiring a hearing in cases where the petitioner has made a plausible claim of ineffective

12

assistance of counsel." Morales v. United States, 635 F.3d 39, 45 (2d Cir. 2011) (quoting Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009)) (internal quotation marks omitted).  To warrant a hearing, a petitioner's "application must contain assertions of fact that [the] petitioner is in a position to establish by competent evidence." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987) (citations omitted); see also LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005).  The court must then determine whether, viewing the record "in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief." Puglisi, 586 F.3d at 213.  If any material facts are in dispute, and a petitioner can identify the available sources of the relevant evidence, a petitioner's claims will warrant a hearing.  See id. at 213-14 (noting that "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases . . . .").  But "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Aiello, 814 F.2d at 113-14; Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007).  The Court is not required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214.  And if it "plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Puglisi, 586 F.3d at 213 (citations omitted).

However, even when a hearing may be warranted, "'the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner.'" Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)); see 28 U.S.C. § 2255(c) ("A court may entertain and determine such motion without requiring the production

13

of the prisoner at the hearing."); see also Campusano v. United States, 442 F.3d 770, 776 (2d

Cir. 2006) ("the district court has discretion to determine if a testimonial hearing will be

conducted"). Depending on the allegations in the petition, a "court may use methods under [§]

2255 to expand the record without conducting a full-blown testimonial hearing." Chang, 250

F.3d at 86 (citing Blackledge v. Allison, 431 U.S. 63, 81-82 (1977)). Potential methods

available to a court to supplement the record include "'letters, documentary evidence, and, in an

appropriate case, even affidavits.'" Chang, 250 F.3d at 86 (quoting Raines v. United States, 423

F.2d 526, 529-30 (4th Cir. 1970)).

It is well established that § 2255 "may not be employed to relitigate questions which

were raised and considered on direct appeal." Barton v. United States, 791 F.2d 265, 267 (2d

Cir. 1986) (per curiam); accord United States v. Sanin, 252 F.3d 79, 83 (2d Cir.) (per curiam)

(citing cases), cert. denied, 534 U.S. 1008 (2001). "'Reconsideration is permitted only where

there has been an intervening change in the law and the new law would have exonerated a

defendant had it been in force before the conviction was affirmed on direct appeal.'" Sanin, 252

F.3d at 83 (quoting Chin v. United States, 622 F.2d 1090, 1092 (2d Cir. 1980), cert. denied, 450

U.S. 923 (1981)); see also United States v. Frady, 456 U.S. 152, 164-65 (1982) ("Once the

defendant's chance to appeal has been waived or exhausted . . . we are entitled to presume he

stands fairly and finally convicted, especially when . . . he already has had a fair opportunity to

present his federal claims to a federal forum. . . .  [A] final judgment commands respect.").

B.      Law Governing Ineffective Assistance of Counsel Claims

"In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's

representation fell below an objective standard of reasonableness'; and (2) 'that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.'"  Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (quoting

Strickland v. Washington, 466 U.S. 668, 694 (1984)); accord United States v. Brown, 623 F.3d

104, 112 (2d Cir. 2010); see also Massaro, 538 U.S. at 505 ("[A] defendant claiming ineffective

counsel must show that counsel's actions were not supported by a reasonable strategy and that

the error was prejudicial.").  "[F]ederal district courts need not address both components if a

petitioner fails to establish either one."  Leano v. United States, 2010 WL 3516221, at *5

(E.D.N.Y. Aug. 31, 2010) (quoting Strickland, 466 U.S. at 697).

    In evaluating the first prong – whether counsel's performance fell below an objective

standard of reasonableness – "'[j]udicial scrutiny . . . must be highly deferential'" and the

petitioner must overcome the "'presumption that, under the circumstances, the challenged action

might be considered sound trial strategy.'"  Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting

Strickland, 466 U.S. at 689); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according

counsel a presumption of competence).  Concerning the second prong – whether there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different – the Second Circuit generally "requires some objective evidence

other than defendant's assertions to establish prejudice."  Pham, 317 F.3d at 182 (citing United

States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)).

III.    DISCUSSION

    We now discuss each claim to determine whether it warrants an evidentiary hearing.

    A.    Counsel's Failure to Convey the Government's Plea Offer and
          Failure to Provide a Full Understanding of the Risks of Going to
          Trial

    As discussed above, Vargas has asserted a claim of ineffective assistance of counsel

based on his counsel's purported failure to convey an alleged five-year plea offer from the

Government and failure to provide Vargas with "a full understanding of the risks of going to trial." Pet. Motion at 3-4.  "To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that 'he will necessarily succeed on the claim.'" Puglisi, 586 F.3d at 213 (citations omitted).  Though the Court need not assume the credibility of factual assertions that are contradicted by the underlying record, id. at 214, and does not need to credit "airy generalities, conclusory assertions, and [the petitioner's] hearsay statements," Aiello, 814 F.2d at 113-14, a hearing should nonetheless be granted where the petitioner has proffered "arguably credible evidence of a prima facie case" of ineffective assistance of counsel, see Puglisi, 586 F.3d at 215.

        One of the basic duties of a defense attorney is to provide clients with the benefit of his or her advice on whether to plead guilty.  See Purdy v. United States, 208 F.3d 41, 44-45 (2d Cir. 2000); Carrion v. Smith, 644 F. Supp. 2d 452, 466 (S.D.N.Y. 2009), aff'd, 365 F. App'x 278 (2d Cir. 2011).  "As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy, 208 F.3d at 45 (citing Cullen v. United States, 194 F.3d 401, 404; Gordon, 156 F.3d at 380).  "As such, counsel's failure to convey a plea offer falls below an objective standard of reasonableness and thus satisfies Strickland's first prong."  United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010).  To establish a claim of ineffective assistance of counsel based on the attorney's failure to adequately advise a client as to whether to plead guilty, petitioner must show that (1) counsel failed to provide adequate advice about a possible plea offer, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors," petitioner would have accepted the plea offer.  Puglisi, 586 F.3d at 215; Purdy, 208 F.3d at 45-49.  Petitioner may

make this latter showing by submitting a declaration or affidavit which contains their own sworn statements, provided "it is accompanied by some 'objective evidence,' such as a significant sentencing disparity, that he or she would have accepted the proposed plea offer if properly advised." Puglisi, 586 F.3d at 216 (citations omitted); accord Raysor v. U.S., 647 F.3d 491, 496 (2d Cir. 2011); Brown, 623 F.3d at 112; Purdy v. Zeldes, 337 F.3d 253, 259 (2d Cir. 2003)..

Here, Vargas has proffered such evidence.  In support of his motion, Vargas has submitted his own declaration which states that he asked Schmukler to try to obtain a five-year plea offer and told him that "if the [G]overnment agreed to the five years," he would plead guilty.  Declaration of Caonabo Vargas, II (annexed as Ex. 2 to Pet. Reply) ("C. Vargas Decl.") ¶ 7.  Vargas claims that Schmukler never conveyed any plea offer to him, see C. Vargas Decl. ¶ 37, and told him that the Government had "rejected [his] offer to plead guilty to the charges in exchange for a five year sentence," id. ¶ 9.  Schmukler advised Vargas to "maintain[ his] innocence and contest[ ] the charges at trial," id. ¶ 11, and never told him "that if [Vargas] maintained [his] innocence the [G]overnment could obtain a superseding indictment against [him] with additional charges and evidence," id. ¶ 12.  "After the [G]overnment obtained a superseding indictment against [Vargas], Schmukler never advised [him] to revisit a plea option."  Id. ¶ 24.  In addition, Vargas claims that Schmukler never informed him that the Government had "overwhelming evidence of his guilt" and that he was likely to be convicted at trial, id. ¶¶ 13, 14; that "a drug conspiracy conviction could be proven with no physical evidence," id. ¶ 15; see id. ¶ 16; that he was facing a ten-year mandatory minimum if he lost at trial, id. ¶ 17; and he never advised him as to how the federal sentencing guidelines worked and how they could impact Vargas's sentence, id. ¶¶ 18, 19.  Had Vargas been advised of these facts and had he been told of the true risks of going to trial and his true sentencing exposure, Vargas

17

would have "accepted the plea bargain, pursued a plea option, or pled out without the benefit of a deal."  Id. ¶¶ 30-34.  "Had [Vargas] known that the [G]overnment was willing to agree to a plea bargain that would have resulted in not more than five years, [he] would have accepted the plea bargain and pled guilty to the charges."  Id. ¶ 29.

In opposition, the Government has proffered the affirmation of Martin Schmukler, see Affirmation, dated Dec. 15, 2010 (annexed as Ex. A to Gov. Mem.) ("Dec. 15 Schmukler Aff."), in which he states that Vargas was well aware of the Government's plea offer and that it was Vargas's decision "not to accept a plea offer[,] choosing instead to go to trial," Dec. 15 Schmukler Aff. ¶ 6.  Schmukler further asserts "that the plea offer was communicated to Vargas by both [Schmukler] and Mr. Del Valle[, that] trial strategy was discussed at length," and that "it was [Vargas's] insistence of his innocence that any plea offer was refused."  Id. ¶ 8.

 In support of his motion, Vargas has also submitted the declaration of Del Valle.  See Declaration of Telesforo Del Valle, Jr. (Annexed as Ex. 1 to Pet. Reply) ("Del Valle Decl.").  In this declaration, Del Valle states that he "was not involved in any plea bargain discussions that may have occurred between Schmukler, Vargas and the U.S. Attorney's Office" and that he "did not counsel Vargas with respect to any plea bargain discussion that may have occurred between Schmukler, Vargas and the U.S. Attorney's Office." Del Valle Decl. ¶¶ 4, 5.  These statements contradict Schmukler's assertion that he and Del Valle both conveyed the plea agreement and discussed trial strategy with Vargas.

While the Government contends that the contradictions in Schmukler's original affirmation have been rectified by a subsequent affirmation, the Court believes that the additional submission does not lay to rest the disputed factual issues.  For example, Schmukler states that he recalls "that the best offer Vargas ever received was seventy-eight months, which

[Vargas] rejected."  Affirmation, dated April 2011 (annexed as Ex. A to Gov. Sur-Reply) ("Apr. 2011 Schmukler Aff.") ¶ 5.  This statement is contradicted, however, by Schmulker's first affidavit, <u>see</u> Dec. 15 Schmukler Aff., ¶ 8, and by the transcript of sentencing where Schmukler stated on the record that Vargas had been offered a "plea that would have resulted in not more than five-years confinement."  (S. Tr. 9-10).  Schmulker provides no explanation for the apparent contradiction.

On the question of prejudice, there is objective evidence that could support a finding that Vargas would have accepted a plea offer in that the Government's case at trial was strong; there was overwhelming evidence of Vargas's guilt, <u>see</u> <u>Morales v. Boatwright</u>, 580 F.3d 653, 663 (7th Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 1516 (2010); and that there was a "significant disparity" between the alleged five-year plea offer and the possible 13-year sentence that the Government contends Vargas faced on the original Indictment, <u>see</u> Gov. Sur-Reply at 16.  <u>See</u> <u>generally</u> <u>Pham</u>, 317 F.3d at 183 ("The disparity here was a plea offer of 78 to 97 months and a sentence after trial of 210 months, which is more than double.  Our precedent at a minimum indicates that the district court erred in summarily determining the absence of prejudice without even considering the sentence disparity."); <u>cf.</u> <u>Purdy</u>, 208 F.3d at 47 (court finds that disparity between length of potential sentence (27-33 months) and plea offer (18-24 months) not significant enough to trigger presumption of prejudice).  Accordingly, Vargas has proffered sufficient objective evidence of prejudice to warrant the granting of an evidentiary hearing.

For these reasons, Vargas will be granted an evidentiary hearing on the issue of whether he received ineffective assistance of counsel with respect to his counsel's advice regarding any plea offers made by the Government.  The Court will not at this time address the issue of Vargas's claims regarding the advice he was given as to the risks of going to trial but will

19

instead hear testimony on this point from Vargas and Schmulker at the evidentiary hearing.

      B.      <u>Vargas's Remaining Claims</u>

To the extent Vargas seeks an evidentiary hearing on his remaining claims, the request is denied as the face of the petition, or the documents submitted by each side in support thereof, do not show that Vargas is entitled to relief on any of these claims.

      1.      <u>Counsel's Alleged Failures at Trial</u>

As discussed above, Vargas has asserted various claims of ineffective assistance of counsel relating to Schmukler's performance at trial.  Specifically, Vargas contends that the following acts constitute ineffective assistance of counsel: (1) counsel failed to investigate eyewitnesses, failed to interview eyewitnesses, and failed to present exculpatory eyewitness testimony; (2) counsel conducted poor cross-examinations of two witnesses and failed to use readily available information to rebut the Government's evidence; (3) counsel failed to adequately prepare Vargas to testify at trial; and (4) counsel failed to exclude evidence related to witnesses Negron and Ralat.

With respect to the failure to investigate claim, Vargas suggests that there were a number of witnesses who worked in his real estate office that would have testified to the fact that he had clients coming in regularly and that they never saw any illegal activity.  But petitioner's counsel called two such witnesses who so testified.  (<u>See</u> Delgadillo: Tr. 1413-21; O. Vargas: Tr. 1422-35).  It cannot be said that counsel's decision not to call additional witnesses on this point fell below an objective standard of reasonableness.  Moreover, there is no prejudice resulting from this failure as the fact that petitioner had a functioning real estate office was entirely consistent with the Government's case.  Thus, testimony that he had such an office would not have negated the telephone calls and the testimony of the witnesses showing that he also engaged in a

20

conspiracy to commit robbery and distribute narcotics.

As to the issue of cross-examination, Vargas makes various complaints about his counsel's conduct.  Pet. at 9-11.  Some of these are difficult to follow but none of them suggest any improper conduct by counsel.  The mere fact that the jury gave a note that mistakenly suggested that Vargas built a trap, Pet. at 9, cannot be attributed to counsel's conduct.  To the extent that petitioner is arguing that counsel should have elicited the fact that the Government offered to get Negron's boyfriend Julio out on bail, id. at 9, 10, that fact was elicited by counsel (Tr. 1071).  The other matters for which petitioner faults defense counsel are either minor matters that could not have had any effect on the jury's decision or were not relevant to the Government's theory of why petitioner was guilty.

Petitioner's complaints regarding his attorney's failure to prepare him for trial are contradicted by his attoney, who states that he devoted extensive time to such preparation.  Dec. 15 Schmukler Aff ¶ 15.  In any event, Vargas did testify to the various things he says he should have been asked about, see Pet. at 12, such as the fact that he was never involved in the narcotics trade (Tr. 1387-88), or had not participated in any robberies (Tr. 1381-87).

Finally, petitioner argues that counsel failed to exclude evidence related to witnesses Negron and Officer Ralat.  See Pet. at 12.  But petitioner does not explain what action counsel should have taken with respect to these witnesses.  Counsel in fact objected to the admission of Negron's statements – an objection that formed the basis of his appeal.  See Vargas, 306 F. App'x at 625.  There is no basis on which to conclude that there is some other action counsel should have taken with respect to these witnesses.

2.     Errors Alleged With Respect to Sentencing

Vargas makes the following claims with respect to sentencing: (1) counsel denied Vargas

effective assistance of counsel by allowing the court to impose a sentence greater than authorized by the jury's verdict; (2) the trial court denied petitioner a fair sentencing proceeding in violation of his Fifth Amendment Due Process Right and his Sixth Amendment Right to a Jury Trial; and (3) counsel denied petitioner the effective assistance of counsel by failing to appeal his sentence, the trial court's application of the sentencing guidelines, and the trial court's violation of his constitutional rights.   These claims are also without merit.

a.     <u>Counsel's Failure to Challenge the Trial Court's Sentence</u>

Petitioner asserts that his attorney was ineffective because he failed to obtain a sentence of 120 months, the statutory minimum.  Pet. at 14-16.  Specifically, Vargas contends that his counsel should have made the following arguments at sentencing: (1) Vargas deserved the statutory minimum sentence because there was no physical evidence of the quantity of drugs involved and his conviction was based only on the testimony of five criminal witnesses; (2) Vargas should have been held accountable for only a portion of the conspiracy; and (3) the trial judge should not have considered facts not found by the jury to determine the appropriate sentencing guidelines range.

As discussed above, to prevail on a claim of ineffective assistance of counsel, petitioner must show that counsel's conduct was deficient, meaning it fell "outside the wide range of professionally competent assistance," <u>Strickland</u>, 466 U.S. at 690, and establish prejudice by showing that a "reasonable probability" exists that but for counsel's errors the result of the proceeding would have been different, <u>id.</u> at 694.  "In a sentencing context, an ineffective assistance claim requires a 'demonstrat[ion] that the alleged errors of [ ] counsel so prejudiced [the petitioner] that but for these errors, the result of his sentencing hearing would have been different.'"  <u>Leano</u>, 2010 WL 3516221, at *4 (quoting <u>United States v. Robinson</u>, 354 F. App'x

22

518, 520 (2d Cir. 2009), cert. denied, 130 S. Ct. 2356 (2010)).  Here, Vargas has failed to

establish either prong of the Strickland test.

There is no reason to believe that counsel's conduct at sentencing fell below the range of

reasonable professional assistance.  As an initial matter, the Court notes that Schmukler made

many of the arguments Vargas contends were absent from his sentencing hearing.  While Vargas

asserts that counsel failed to argue that the evidence presented at trial did not warrant a sentence

in excess of the mandatory minimum, the sentencing transcript reflects that Schmukler

extensively argued that the court should not impose a sentence greater than the statutory

mandatory minimum of ten years.  (S. Tr. 7-10).  In making this argument, Schmukler discussed

the evidence presented at trial.  He specifically noted that "there was not one act of violence

directly [or indirectly] attributed to [Vargas]" (S. Tr. 8), that drugs were never found in Vargas's

possession or in his home, id., and that Vargas's sole role in the conspiracy was to provide others

with information "that enabled them to target drug dealers" (S. Tr. 9).  Furthermore, counsel's

arguments proved to be effective since Vargas was ultimately sentenced to 151 months

imprisonment and not a sentence in the 235 to 293 month range as called for by the Sentencing

Guidelines, or the 235 month sentence recommended by the probation department.  See S. Tr. 7;

Gov. Mem. at 25.

While Schmukler did not explicitly state that Vargas should not be held accountable for

the entire drug conspiracy and that the court should not consider facts not found by the jury to

determine the appropriate sentencing guidelines range, his failure to do so does not constitute

conduct "outside the wide range of professionally competent assistance" because neither of these

arguments had merit.  In determining the proper base offense level to apply to a defendant

involved in a drug conspiracy, the Sentencing Guidelines specifically provide that a defendant is

responsible for all foreseeable acts of the conspiracy.  See U.S. Sentencing Guidelines Manual § 1B1.3(a)(1).[2]

Furthermore, even if Vargas should have been held accountable only for the proceeds of the drug conspiracy he personally received, Vargas would nonetheless have been found to fall within an offense level of at least 34.  During the trial, Jose Stepan testified that he had given Vargas "20 kilos" of cocaine to sell and distribute.  (Stepan: Tr. 773).  This single 20-kilogram transaction would have resulted in the same offense level used by the district court, offense level 34.

Nor did the court violate petitioner's constitutional rights by using facts not determined by the jury to select the appropriate guidelines range.  District court judges are "statutorily obliged to 'consider'" the Federal Sentencing Guidelines (the "Guidelines"), "which necessarily means they must determine the Guidelines range applicable to a particular defendant."  United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005).  In making this determination, judges are free to find facts relevant to sentencing by a preponderance of the evidence, see id., and are

---

[2]  The relevant provision provides that a defendant is to be held responsible for:

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

U.S. Sentencing Guidelines Manual § 1B1.3

not limited to only those facts determined by the jury, United States v. Booker, 543 U.S. 220, 223 (2005) ("when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant").  Indeed, a sentencing judge would commit an error "by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range . . . based on the facts found by the court." United States v. Crosby, 397 F.3d 103, 115 (2d Cir. 2005), cert. denied, 549 U.S. 915 (2006). Thus, "when a judge sentences a defendant within the statutory range authorized by the jury verdict and uses advisory Guidelines to calculate that sentence, there is no Sixth Amendment violation," provided the court does not apply the Guidelines mandatorily.  United States v. Vaughn, 430 F.3d 518, 528 (2d Cir. 2005), cert. denied, 547 U.S. 1060 (2006); Garcia, 413 F.3d at 220 n.15.

Here, there is no indication that the court applied the Guidelines mandatorily.  To the contrary, the court explicitly noted that it was not bound by the "mandatory constraints of the guidelines," and was merely consulting and taking them into account on sentencing.  (S. Tr. 11). Therefore, it cannot be said that the court committed an error or denied the petitioner his constitutional rights by using facts not determined by the jury to select the appropriate Guidelines range.

The Supreme Court's decision, in Cunnigham v. California, 549 U.S. 270 (2007), does not alter this result.  In Cunnigham, the Supreme Court held that California's determinate sentencing law (DSL), which authorized the judge, not the jury, to find facts by a preponderance of the evidence exposing a defendant to an elevated upper term sentence violated a defendant's right to trial by jury.  Id. at 289-90.  In doing so, however, the Court noted that the ruling did not

25

apply to the Guidelines, id. at 287 n.13, and rejected any attempted analogy between the DSL and the Guidelines since the DSL were mandatory and the Guidelines are advisory, see id. at 291-92; Besser v. Walsh, 601 F.3d 163, 188 (2d Cir.), cert. denied, 1315 S. Ct. 342 (2010). Thus, Cunningham does not affect a court's ability to "find facts to establish the [G]uideline range within the applicable statutory maximum."  United v. Zapata, 589 F.3d 475, 484 (1st Cir. 2009).

Accordingly, Vargas's claim for ineffective assistance of counsel fails.

### b.   Trial Court's Denial of a Fair Sentencing Proceeding

Petitioner argues that his sentencing was improper because it imposed a sentence "in the absence of findings beyond a reasonable doubt." Pet. at 16.  This appears to refer to the argument that the district court engaged in improper factfinding in imposing sentence, already made in the context of Vargas's argument regarding ineffective assistance of counsel.  For the reasons just stated, this claim fails on the merits.  Additionally, it would be procedurally barred since it could have been raised on direct review and was not.  See, e.g., Bousley v. United States, 523 U.S. 614, 622 (1998); Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007).  While an exception to such a bar exists where "cause" or "actual innocence" has been demonstrated, the only "cause" for failure to raise the claim is ineffective assistance of counsel which, as described above, did not occur here.  In addition, petitioner has not shown that he is actually innocent.

### c.   Counsel's Failure to Appeal the Trial Court's Sentence

Vargas contends that his counsel was ineffective because he failed to raise on appeal the length of his sentence, the court's calculation of drug quantity at sentencing, and the court's use of evidence not found by the jury to determine the appropriate Guidelines range.

Claims of ineffective assistance of appellate counsel are also evaluated under the

<u>Strickland</u> standard.  <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000).  Under this standard, "[a]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  <u>Smith</u>, 528 U.S. at 288 (citing <u>Jones v. Barnes</u>, 463 U.S. 745 (1983)).  "[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir.), <u>cert.</u> <u>denied</u>, 513 U.S. 820 (1994).  In order to establish prejudice, a petitioner must show "that there was a reasonable probability that [his] claim would have been successful" on appeal.  <u>Id.</u> at 534 (citing <u>Claudio v. Scully</u>, 982 F.2d 798, 803 (2d Cir. 1992), <u>cert.</u> <u>denied</u>, 508 U.S. 912 (1993)).

Vargas has failed to make such a showing.  Though Vargas's appeal was ultimately unsuccessful, Vargas has not provided the Court with an explanation, let alone any evidence, as to why the arguments raised on appeal were "clearly and significantly" weaker then the arguments he now asserts.  Nor could he since, as discussed above, these arguments lacked merit.

3.    <u>Counsel's Failure to Object to and Appeal the Court's Decision to Lock Courtroom During Jury Charge</u>

In a supplemental filing, Vargas asserted a claim for ineffective assistance of counsel predicated on his attorney's failure to object to and appeal the court's decision to lock the courtroom during the jury charge.[3]  Sup. Motion.  The Government has not opposed the motion

---

[3]  In their papers filed in opposition, the Government construed this filing as asserting a separate violation of the Sixth Amendment right to a public trial in addition to raising a claim for ineffective assistance of counsel.  <u>See</u> Gov. Mem. at 27-28.  In doing so, the Government argued that the claim is procedurally barred since it was not raised on appeal.  <u>See</u> <u>id.</u> at 28.  Petitioner's

to amend the petition to include this claim.  As a result, the Court grants the motion to amend.

Nonetheless, petitioner is not entitled to a hearing on this claim because it lacks merit.

Prior to giving the jury instruction, the court directed the clerk to "lock the courtroom."

(Tr. 1767).  Before giving this instruction, however, the court made the following statement:

> Let me then proceed, now these instructions are going to last perhaps an hour and
> a half or maybe two hours.  So if there is someone in the room who cannot remain
> for that period of time, this is a time to leave, because we're going to lock the
> courtroom, and you will not be able to enter or leave while the Court is giving the
> instructions.

Id.  Vargas contends that as a result of this order, his parents were not able to watch the jury

charge since Vargas's father suffered from a health condition "that requir[ed] that he [urinate]

every 15 to 30 minutes . . . ."  Sup. Mtn. Mem. at 2.  Vargas's claim of ineffective assistance of

counsel is premised on his contention that the locking of the courtroom violated his

constitutional right to a public trial and thus that his attorney should have objected to this

procedure.

The Sixth Amendment protects an accused's right to an open, public trial.  See Waller v.

Georgia, 467 U.S. 39, 46-50 (1984).  This right, "may give way in certain cases to other rights or

interests," however.  Id. at 45.  "The presumption of openness may be overcome only by an

overriding interest based on findings that closure is essential to preserve higher values and is

narrowly tailored to serve that interest.  The interest is to be articulated along with findings

specific enough that a reviewing court can determine whether the closure order was properly

---

reply papers, however, makes clear that he intends this claim only to assert ineffective assistance
of counsel.  Pet. Reply at 27-28.  Thus, petitioner's claim is not procedurally barred, since "an
ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255,
whether or not the petitioner could have raised the claim on direct appeal."  See Massaro, 538
U.S. at 504.

entered."  Id. (quoting Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984)).

Not all restrictions that a court places on access to a courtroom, however, constitute a closure for Sixth Amendment purposes.  See Herring v. Meachum, 11 F.3d 374, 379-80 (2d Cir. 1993), cert. denied, 511 U.S. 1059 (1994).  Where the court's restriction fails to rise to the level of a closure, petitioner's Sixth Amendment right is not implicated.  See id. at 380; United States v. Scott, 564 F.3d 34, 38-39 (1st Cir. 2009); McCarthy v. Portuondo, 2001 WL 826702, at *8-9 (E.D.N.Y. May 25, 2001) (court's decision not to disrupt the trial to permit petitioner's mother to enter the courtroom did not constitute a closure implicating petitioner's right to a public trial.), aff'd, 62 F. App'x 17 (2d Cir. 2003).  Thus, a restriction is permitted provided it is reasonable. See Herring, 11 F.3d at 380 (citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 551, 581 n.18 (1980) (plurality opinion)); Scott, 564 F.3d at 38-39; McCarthy, 2001 WL 826702, at *8-9.

In Herring v. Meachum, the petitioner alleged a violation of his right to a public trial based on the court's decision to lock the courtroom during the jury charge.  See Herring, 11 F.3d at 379.  The Second Circuit held that the court's restriction did not constitute a "closure" under the Sixth Amendment because "spectators had unrestricted courtroom access throughout the trial, including the jury charge, as long as they arrived before it began" and "[f]or those who arrived late, transcripts of the jury charge were available."  Id. at 380.  A similar result was reached by the First Circuit in United States v. Scott.  See Scott, 564 F.3d at 38-39 (court's decision to lock courtroom during jury charge did not violate petitioner's Sixth Amendment right since the public "was indeed present at the jury charge and with its presence cast the sharp light of public scrutiny on the trial proceedings").  Here, as in Herring and Scott, counsel was entitled to believe that an objection was pointless inasmuch as the court made "a reasonable judgment that the lengthy and complex nature of the jury charge . . . justified requiring that members of the

public not enter or exit the courtroom during the instruction." Scott, 564 F.3d at 38; see Herring, 11 F.3d at 380.  Vargas contends that the Herring decision is in tension with the Supreme Court's recent ruling in Presley v. Georgia, 130 S. Ct. 721 (2010) (per curiam).  Sup. Mtn. Mem. But in Presley, the public was prohibited from viewing the jury voir dire at all. Id. at 722.

Because the claim lacks merit, there was no ineffective assistance with respect to counsel's conduct in failing to raise it at the trial level.  Nor was counsel ineffective for failing to raise this issue on appeal.  As discussed above, to demonstrate that Schmukler's failure to raise this claim constitutes deficient performance, Vargas must show that the claims advanced on appeal were clearly and significantly weaker than then the claim he proposes to have been included.  See Mayo, 13 F.3d at 533.  Vargas's arguments relating to the alleged denial of his right to a public trial are unpersuasive.  Thus, it was reasonable for counsel to conclude that they should not have been raised on appeal.[4]

IV.   CONCLUSION

For the foregoing reasons, Vargas will be assigned counsel and provided an evidentiary hearing with respect to the claim that his counsel failed to adequately advise him concerning any plea agreements.  There is no need for a hearing on the remaining issues as they lack merit.[5] Lastly, petitioner's motion to amend the petition (Docket # 221 in 05 Cr. 1327) is granted.

---

[4] Vargas has raised a claim for ineffective assistance of counsel predicated on the "cumulative errors" of counsel.  See Pet. at 18.  In light of the fact that a hearing is not required as to any claim, other than the claim regarding advice on pleading guilty, no hearing is required as to the "cumulative effect" claim.

Dated: October 20, 2011
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies to:

Caonabo Vargas
53389-054
FCI Fort Dix-West
P.O. Box 2000
Unit 5803
Fort Dix, NJ 08640

Joan Loughanne
Assistant U.S. Attorney
One St. Andrew's Plaza
New York, NY 10007

31