UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CAONABO VARGAS,                                  :

          Petitioner,                      :
                                                                    05 Cr. 1327 (VM)
                                                 :                  10 Civ. 2933 (GWG)

             -v.-                     :                  <u>OPINION AND ORDER</u>

UNITED STATES OF AMERICA,                        :

          Respondent.                      :
------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Caonabo Vargas was convicted by a federal jury of conspiracy to commit Hobbs Act

robberies in violation of 18 U.S.C. § 1951, and conspiracy to distribute cocaine, heroin, and

marijuana in violation of 21 U.S.C. § 846.  On January 11, 2008, he was sentenced to a prison

term of 151 months.  On December 17, 2008, the United States Court of Appeals for the Second

Circuit affirmed the judgment of conviction.  Vargas, who remains incarcerated, petitioned this

Court <u>pro se</u> pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.  The

parties consented to disposition of the petition by a United States Magistrate Judge.  In a

previous opinion, <u>Vargas v. United States</u>, 819 F. Supp. 2d 366 (S.D.N.Y. 2011) ("<u>Vargas I</u>"),

this Court rejected several claims raised by Vargas in his petition and ordered an evidentiary

hearing limited to the issue of whether Vargas received effective assistance of counsel as to

advice he was given with respect to any plea offers made by the Government.  The evidentiary

hearing took place on August 7, 2012, and was followed by post-hearing briefing.

      For the reasons stated below and in <u>Vargas I</u>, Vargas's petition for habeas corpus is

denied.

1

I.    BACKGROUND

A.    Proceedings in the Criminal Case

In December 2005, Vargas and others were charged in a three-count indictment, alleging conspiracy to commit robbery; robbery; and using, carrying or brandishing a firearm (or aiding and abetting the same) in relation to the robbery charges.  See Sealed Indictment, filed Dec. 27, 2005 (Docket # 1 in 05 Cr. 1327) (unsealed on January 19, 2006).  At his arraignment, Vargas was represented by a retained attorney, Telesforo Del Valle.  See Docket Entry, dated Jan. 19, 2006 (in 05 Cr. 1327).  James Michael Roth filed a notice of appearance on behalf of Vargas on March 28, 2006.  See Notice of Attorney Appearance, filed Mar. 28, 2006 (Docket # 23 in 05 Cr. 1327).  On June 6, 2006, a notice of substitution of counsel was filed, stating that both Martin Schmukler and Del Valle were representing Vargas.  See Notice of Substitution, filed June 6, 2006 (Docket # 36).  The same day, Schmukler filed a notice of appearance on Vargas's behalf. See Notice of Appearance, filed June 6, 2006 (Docket # 37).

The case was assigned to the Honorable Victor Marrero, who in December 2006 set a trial date of January 22, 2007.  See Order, dated Dec. 1, 2006 (Docket # 51 in 05 Cr. 1327).  On January 8, 2007, the Government filed a superseding indictment against Vargas, adding a charge of conspiracy to distribute and possess with intent to distribute controlled substances.  See Indictment, filed Jan. 8, 2007 (Docket # 54 in 05 Cr. 1327).  Judge Marrero presided over Vargas's trial, which took place in March and April 2007.  See Trial Transcripts, filed Apr. 27, 2007 (Docket ## 91–93 in 05 Cr. 1327) ("Trial Tr.").  Over the course of the 18-day trial, the Government offered testimony from four cooperating witnesses, Jose Stepan, Ramon Solis, Maximo Guillen, and Socrates Vizcaino; testimony from a confidential informant, Ingrid Negron; translations of recorded conversations between Negron and Vargas; and physical

2

evidence.

The evidence showed that from at least 1997, Vargas operated a real estate office in the Bronx.  (See Stepan: Trial Tr. 759; Solis: Trial Tr. 822–23).  From this office, Vargas rented apartments to individuals whom he knew to be involved in robberies and drug dealing.  (See Stepan: Trial Tr. 763, 806, 808; Solis: Trial Tr. 822, 827).  As a result of this work, Vargas was privy to the personal information and addresses of various drug dealers and robbers.  (See, e.g., Stepan: Trial Tr. 767).  Generally robbers and drug dealers refrain from disclosing this information because disclosure of this kind of information may result in the dealer or robber being robbed himself.  (See, e.g., Stepan: Trial Tr. 800–01, 808).  Vargas used this information to act as a "santero" for a group of men who made their living robbing drug dealers.  (Stepan: Trial Tr. 748, 759–61, 793).  As a "santero," Vargas would provide these men with the addresses of the drug dealers, the place where the drugs were located in the house, and the location of the house.  (See Stepan: Trial Tr. 748, 800–01).  In addition, the "santero" would verify that drugs or money were within the house.  (See Stepan: Trial Tr. 749).  In exchange for this information, Vargas received a "good part" of the proceeds of any robbery.  (Id.)

Vargas provided Stepan and his partner "Rubio" with the address and the "specific information of an apartment" in the Bronx where some people who were bringing drugs into the United States were residing.  (Stepan: Trial Tr. 761).  Vargas took Stepan and Rubio to the apartment and told them where the drugs were "so [they] could steal them."  (Id.)  Specifically, Vargas told Stepan that the drugs were located in a "trap, . . . a secret compartment that drug dealers use to stash their drugs so the police cannot find [them]."  (Stepan: Trial Tr. 763–64).  After receiving this information, Stepan, Rubio, and others committed the robbery, and found approximately one thousand pounds of marijuana in the location that Vargas had described.

(Stepan: Trial Tr. 765).  The marijuana was distributed amongst the "participa[nts] in the robbery" and a portion was given to Vargas.  (Stepan: Trial Tr. 766).

Vargas also provided Stepan with information about a potential robbery in New Jersey involving 300 kilograms of drugs.  (See Stepan: Trial Tr. 771).  Vargas told Stepan "that he knew some Mexicans" who had left a van containing 300 kilos of drugs illegally parked in New Jersey.  (Id.)  The sheriff had towed and taken away the van and drugs were still located within the van, hidden under fruit and produce.  (See id.)  Upon hearing this information, two members of Stepan's crew went to New Jersey to "check[] . . . out" the location of the potential robbery.  (Id.)  After learning that the van was parked in a location where there were cameras, Stepan decided not to commit the robbery.  (See Stepan: Trial Tr. 772–73).

Solis also utilized Vargas's services as a santero.  (See Solis: Trial Tr. 827–28, 903–04, 907–08).  In 1999, Solis met with Vargas to discuss a potential "job" on Gun Hill Road in the Bronx.  (Solis: Trial Tr. 903).  Vargas took Solis and others to the Gun Hill Road house and told them that the persons residing there were stashing "a load" of cocaine.  (Solis: Trial Tr. 903–04).  After learning that Vargas had never actually seen the drugs, Solis and his crew decided not to commit the robbery.  (Solis: Trial Tr. 904).  Vargas and Solis discussed two additional potential robberies.  Sometime in 2000 or 2001, Solis met with Vargas and his "woman" Evelyn at Vargas's office in the Bronx.  (Solis: Trial Tr. 906).  The three discussed a potential "jewelry job," which Solis rejected because "[he did not] steal jewelry."  (Solis: Trial Tr. 906–07).  In the summer of 2001, Solis discussed another potential job "in the area . . . [of] 180th [Street]."  (Solis: Trial Tr. 907).  Vargas told Solis that he "had rented [an apartment] to some Mexicans who came from Mexico with a load [of cocaine]" and that he "had the trap built where the [Mexicans] were going to put the drugs."  (Solis: Trial Tr. 907–08).  Vargas took Solis to the

4

house, showed him the key to the building, and told Solis that he would contact him after he had spoken to the Mexicans.  (Solis: Trial Tr. 909).  Solis never discussed the job with Vargas again and Solis did not commit the robbery.  (Solis: Trial Tr. 909–10).

In addition to conspiring to commit robberies, Vargas also conspired with others to distribute drugs, including those that were stolen in robberies.  (Stepan: Trial Tr. 766–67, 770–71, 773–74).  Stepan testified that he had provided Vargas marijuana as payment for his services as a santero (Stepan: Trial Tr. 766–67) and he had given Vargas 20 kilograms of cocaine to distribute for a drug dealer named "El Fuerte" (see Stepan: Trial Tr. 773). Additionally, Vargas boasted about his sales of both heroin and cocaine during a phone conversation with Negron, which Negron had recorded unbeknownst to Vargas.  Portions of a translated version of the transcript of this conversation were read to the jury.  (Trial Tr. 1188). During the conversation, Negron asked Vargas whether he could obtain heroin for Negron's boyfriend to sell.  See Memorandum of Law in Opposition to Vargas's Motion to Vacate, Set Aside, or Correct Sentence, filed Mar. 25, 2011 (Docket # 21), at 6.  Vargas replied "'[d]on't worry, I'm gonna help you guys.  You guys are gonna make some real good big bucks, both of you are . . . ." Id. at 6.

Evidence was also presented regarding other services that Vargas provided to various robbers and drug dealers.  For a fee, Vargas would put the apartments he rented to robbers "under a specific name" and would take care of setting up the electricity, gas, and telephone under the same name.  (Stepan: Trial Tr. 762–63; see Solis: Trial Tr. 822–27).  In addition, Vargas procured false identification documents for Solis (see Solis: Trial Tr. 837, 923–27) and helped to secure bail for a robber named Chi Chi, in exchange for a million dollars (see Stepan: Trial Tr. 775–76).

5

Vargas testified on his own behalf at trial.  He stated that he was the owner of Gleason Realty, a small real estate business located in the Bronx, and in that capacity he would rent and sell real estate.  (C. Vargas: Trial Tr. 1402–05).  Vargas testified on cross-examination that he was not a licensed real estate broker or agent (see C. Vargas: Trial Tr. 1485) and that his business mainly consisted of "interviewing [persons] who were seeking apartments" (C. Vargas: Trial Tr. 1491), and then "provid[ing] the information to landlords about potential renters and buyers" (C. Vargas: Trial Tr. 1492).  Vargas testified that he did not verify the information provided to him in these interviews.  (See C. Vargas: Trial Tr. 1492–94).

Vargas denied the allegations of the superseding indictment (see C. Vargas: Trial Tr. 1378–89, 1481) and claimed to have had only legitimate, non-criminal contacts with the cooperating witnesses (C. Vargas: Trial Tr. 1437–38, 1444).  Vargas admitted that he had met Stepan and Solis, but testified that he had not assisted either of them in committing any robberies.  (See C. Vargas: Trial Tr. 1437–38, 1447–48, 1481).  Instead, Vargas said he met the two at Gleason Realty when he assisted each in locating apartments.  Vargas testified that he had met Stepan only once, when he and his girlfriend came to Gleason Realty looking for an apartment to rent (C. Vargas: Trial Tr. 1437–38), and that he had met Solis and had rented him two apartments (see C. Vargas: Trial Tr. 1444–48).  Vargas also discussed his relationship with Negron.  Vargas explained that he had met Negron when she came to his office "to apply for an apartment."  (C. Vargas: Trial Tr. 1470).  He stated that the two had had a romantic and physical relationship.  (C. Vargas: Trial Tr. 1473–76).  With respect to the tape recording of their phone conversation, Vargas admitted that it was his voice on the tape recording (C. Vargas: Trial Tr. 1476–77), but stated that the statements he made regarding illegal activity and drugs were made only to "impress" Negron, who was trying to get Vargas to buy drugs, (C. Vargas: Trial Tr.

6

1478, 1482).  Vargas maintained that he had never procured, bought, or stored drugs.  (C. Vargas: Trial Tr. 1481).

Vargas testified that he had not assisted in any robberies.  (C. Vargas: Trial Tr. 1481). On cross-examination, Vargas was asked about the robbery of a group of Mexican drug dealers who were living in a small house rented by Gleason Realty — a robbery that Vargas had offered to Solis.  (See C. Vargas: Trial Tr. 1498).  Vargas initially testified that he was not aware of the robbery.  (C. Vargas: Trial Tr. 1498).  After further examination, however, Vargas admitted not only that he knew about the robbery, but also that he had taken the group of Mexicans to the hospital because they had sustained injuries during the robbery.  (C. Vargas: Trial Tr. 1499–1501).

The defense called two other witnesses — one of whom was Vargas's cousin — who testified regarding Vargas's character and that certain tenants were not robbed.  (O. Vargas: Trial Tr. 1429–32; Delgadillo: Trial Tr. 1416, 1421).

On April 13, 2007, the jury returned a verdict finding Vargas guilty of conspiracy to commit robbery and guilty of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.  (Trial Tr. 1873–75).  In addition, the jury concluded that "it was known or reasonably foreseeable to [Vargas] that the [drug] conspiracy would involve the distribution, or possession with intent to distribute" heroin, five or more kilograms of cocaine, and 1,000 or more kilograms of marijuana.  (Trial Tr. 1875–76).  The jury acquitted Vargas of the substantive robbery count and the firearm count.  (Trial Tr. 1874–75).

Vargas was sentenced on January 11, 2008.  See Transcript of Proceedings Before the Honorable Victor Marrero, dated Jan. 11, 2008 (Docket # 240 in 05 Cr. 1327) ("S. Tr.").  At the sentencing, Schmukler argued for a sentence lower than the 235 months requested by the

Government, arguing, "Indeed, before this case began trial, as recently as a month before trial, the government was offering the defendant a plea that would have resulted in not more than 5 years' confinement." (Schmukler: S. Tr. 9–10).  Vargas then spoke on his own behalf, stating, "I never committed any crime and I am not a bad person." (Vargas: S. Tr. 11).  Judge Marrero found that the applicable guidelines range was 151 to 188 months and sentenced Vargas to 151 months' imprisonment and five years of supervised release. (S. Tr. 12–13).  The judgment of conviction was entered on January 18, 2008.  See Judgment in a Criminal Case, filed Jan 18, 2008 (Docket # 131 in 05 Cr. 1327).

Vargas appealed his conviction on January 31, 2008, see Notice of Appeal, filed Jan. 31, 2008 (Docket # 134 in 05 Cr. 1327), arguing that the district court erred in instructing the jury to presume an effect on interstate commerce if the jury found that the object of the Hobbs Act robbery was illegal drugs or the proceeds of a sale thereof, and that the district court erred in admitting the transcript of recorded conversations between Vargas and the confidential informant.  See United States v. Vargas, 306 F. App'x 623, 624–25 (2d Cir. 2008).  On December 17, 2008, the Second Circuit affirmed Vargas's conviction, holding that while the district court erred in instructing the jury that it could presume an effect on interstate commerce, the effect of this error was "uncertain[,] . . . indeterminate or only speculative."  Id. at 625 (alteration added) (internal quotation marks and citation omitted).  The Second Circuit found no error in the district court's admission of recorded conversations between Vargas and the confidential informant.  Id.

B.     Habeas Petition

On March 18, 2010, the Pro Se Office received Vargas's petition, which is dated March 15, 2010.  See Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255,

8

dated Mar. 15, 2010 (Docket # 1) ("Pet. Mot.").  In that petition, Vargas argued that Schmukler had been ineffective for the following reasons: (1) counsel failed to convey a government plea offer and misadvised him about his sentencing exposure, the risks of going to trial, and the burden of proof required for a conspiracy conviction; (2) counsel failed to investigate eyewitnesses, failed to interview eyewitnesses, and failed to present exculpatory eyewitness testimony; (3) counsel conducted ineffective cross-examinations of two witnesses and failed to use readily available information to rebut the Government's evidence; (4) counsel failed to adequately prepare Vargas to testify at trial; (5) counsel allowed Vargas to receive a sentence greater than the sentence authorized by the jury's verdict; (6) counsel failed to appeal his sentence, the trial court's application of the sentencing guidelines, and the violation of petitioner's constitutional rights; (7) counsel failed to exclude evidence related to two witnesses; and (8) counsel's cumulative errors constituted ineffective assistance of counsel.  Id. at 3–19. Vargas also complained that the "trial court denied [him] a fair sentencing proceeding, in violation of the Due Process Clause of the Fifth Amendment and the jury-trial guarantee of the Sixth Amendment, by calculating and imposing petitioner's sentence in the absence of findings beyond a reasonable doubt."  Id. at 16.  Vargas later added a claim of ineffective assistance of counsel based on counsel's failure to object to and appeal the trial court's decision to lock the courtroom during the jury charge.  See Caonabo Vargas Memorandum of Law and Supplement to Interact an Additional Issue to his § 2255 Motion, dated July 18, 2010 (annexed to Petitioner[']s Motion for Leave of Court to Supplement and Interact an Additional Issue, filed July 21, 2010 (Docket # 221 in 05 Cr. 1327)), at 1–5.

Both sides filed multiple submissions relating to the petition.  On October 20, 2011, this Court rejected a majority of Vargas's claims in his habeas petition in Vargas I.  819 F. Supp. 2d

at 385.  We granted an evidentiary hearing, however, with respect to Vargas's claim that

Schmukler was ineffective based on his failure to convey the Government's plea offer and

failure to provide a full understanding of the risks of going to trial.  Id. at 379.  We specifically

noted unexplained inconsistencies in various affidavits that had been filed, including

contradictions in two affidavits filed by Schmukler.  Id. at 378–79.  Vargas was appointed

counsel for the purposes of the hearing.  See Order, filed Oct. 20, 2011 (Docket # 28).

      C.    <u>Hearing</u>

On August 7, 2012, this Court held the evidentiary hearing.  See Transcript of

Proceedings Before the Honorable Gabriel W. Gorenstein, dated Aug. 7, 2012 (Docket # 40)

("Hr.").  The petitioner called Vargas and Del Valle as witnesses and the Government called

Schmukler.  Before describing the testimony at the hearing, we discuss the written submissions

to the Court relating to plea offers.

      1.    <u>Submissions Regarding Plea Offers</u>

In his petition, Vargas asserted that Schmukler failed to convey an alleged five-year plea

offer from the Government.  Pet. Mot. at 4.  In response to the petition, Schmukler submitted an

affidavit dated December 15, 2010, in which he stated that Vargas "was well aware of an

existing plea proposal," and that it was "his decision not to accept a plea offer choosing instead

to go to trial."  See Affirmation of Martin Schmukler, dated Dec. 15, 2010 (annexed as Ex. A to

Memorandum of Law in Opposition to Vargas's Motion to Vacate, Set Aside, or Correct

Sentence, filed Mar. 25, 2011 (Docket # 21)) ("First Schmukler Aff."), ¶ 6.  Schmukler asserted

that Vargas's statements in his petition that he was never informed by counsel of a five-year plea

offer were untrue.  Id. ¶ 8.  Schmukler made reference in his affidavit to a plea offer of "60

months" and stated that he had "strongly advise[d Vargas] to accept the offer but Vargas ignored

10

and rejected this to his own detriment," and that the plea offer was communicated to Vargas by both Schmukler and by Del Valle.  Id.

In a responsive affidavit, Vargas stated that he had asked Schmukler to try to "plead [him] out for a five year sentence," and told Schmukler he would accept such a deal if the government agreed.  See Declaration of Caonabo Vargas, II, dated Mar. 8, 2011 (annexed as Ex. 1 to Response to Government's Memorandum of Law in Opposition to 2255 Motion, filed Mar. 14, 2011 (Docket # 18) ("3/14/11 Response")) ("Second Vargas Aff."), ¶ 6.  He informed his mother of this conversation.  Id. ¶ 8; see also Affidavit of Lourdes Cortes Roman, dated Feb. 11, 2011 (annexed as Ex. 3 to 3/14/11 Response), ¶ 4.  In December 2006, Schmukler told him that the Government had rejected the offer of a five-year sentence.  Second Vargas Aff. ¶ 9. Schmukler advised him to go forward with trial, and in reliance on this advice, Vargas maintained his innocence and contested the charges at trial.  Id. ¶¶ 10–11.  Vargas stated that Schmukler had not advised him of the risks of going to trial and that had he fully understood them — and had he known the government was willing to agree to a plea bargain of not more than five years — he would have accepted that offer and pled guilty.  Id. ¶¶ 12–38.  He stated that Schmukler's affidavit stating that a plea offer was communicated to him by Schmukler and Del Valle was untrue, and that neither Schmukler nor Del Valle ever told him of a five-year offer.  Id. ¶¶ 37, 39–40.

Telesforo Del Valle submitted a declaration on March 2, 2011.  See Declaration of Telesforo Del Valle, dated Mar. 2, 2011 (annexed as Ex. 2 to Reply to Government's Memorandum of Law in Opposition to Vargas's March 14, 2011 Reply Brief in Support of His § 2255 Motion, filed May 23, 2011 (Docket # 25)) ("May 2011 Reply").  In it, he stated that — contrary to the statement in Schmukler's affidavit — he was "not involved in any plea bargain

11

discussions that may have occurred between Schmukler, Vargas, and the U.S. Attorney's Office"
and that he "did not counsel Vargas with respect to any plea bargain discussions that may have
occurred" between these parties.  Id. ¶¶ 3–4.

      Schmukler then submitted a second affidavit, dated "April 2011," in which he stated that
"it is possible that I was mistaken about whether Mr. Del Valle took an active role in further plea
discussions since his participation in the defense subsided substantially once I appeared."
See Affidavit, dated Apr. 2011 (annexed as Ex. A to Memorandum of Law in Opposition to
Vargas's March 14, 2011 Reply Brief in Support of His § 2255 Petition, filed Apr. 19, 2011
(Docket # 24)) ("Second Schmukler Aff."), ¶ 3.  He stated that he fully conveyed all plea offers
from the government to Vargas and discussed them, explaining Vargas's sentencing exposure
should he proceed to trial.  Id. ¶¶ 4–5.  He stated that he specifically recalled "telling Vargas that
the potential penalties were substantially higher after the narcotics conspiracy charges were
added and advised him that a 10-year mandatory minimum applied to that charge."  Id. ¶ 5.  He
also "specifically recall[ed] that the best offer Vargas ever received was seventy eight months
which he rejected.  He consistently maintained that he would only consider an offer under five
years."  Id. (emphasis in original).  He also stated that Vargas was amply warned of the dangers
he faced at trial on a conspiracy charge.  Id. ¶ 6.

      In a subsequent affidavit, Vargas stated that Schmukler's affirmations that he informed
Vargas of the government's five-year plea offer, that he informed Vargas about the true risks of
going to trial, and that he informed Vargas about his true sentencing exposure, were false.  See
Declaration of Caonabo Vargas, III, dated May 18, 2011 (annexed as Ex. 4 to May 2011 Reply)
("Third Vargas Aff."),¶¶ 9–10.  He also stated that he "spoke little to no English as my primary
language was Spanish.  Prior to my trial in this case, my attorney Martin Schmukler . . . was

fully aware that I lacked fluency, comprehension and proficiency in the English-Language." Id.

¶¶ 3–4.  He also stated that Schmukler never provided him with any "written" advice about "the

government's plea offer, the true risks of trial, or my true sentence exposure." Id. ¶ 12.

### 2. Vargas's Testimony at the August 7, 2012 Evidentiary Hearing

Vargas testified in Spanish through an interpreter.[1]  He testified that Schmukler was the

only attorney he retained for trial, and they discussed the case several times prior to trial.

(Vargas: Hr. 8–9).  Schmukler visited him more than a dozen times while he was incarcerated at

both the MCC in Manhattan and the MDC in Brooklyn, and Del Valle visited him while he was

at the MDC but never at the MCC.  (Vargas: Hr. 9–10).  Vargas had heard fellow inmates

discussing guilty pleas, and so he raised the topic with Schmukler based on these conversations.

(Vargas: Hr. 10).  He stated that "there was one occasion when I said to Schmukler that I would

plead guilty, that I would plead guilty to five years.  I was not going to go to trial if the

government accepted an offer of five years."  (Id.)  Schmukler told him to continue to claim his

innocence because the case was a simple one that he would win.  (Id.)  This conversation took

place in November 2006.  (Vargas: Hr. 11).  In response to his attorney's question as to whether

Schmukler ever informed him of the Government's response to this offer, Vargas stated that

Schmukler had told him to call him the next day because Schmukler was going on vacation, and

that when he did, Schmukler stated that the government had refused the five-year offer.  (Id.)

After that call, "[t]here was never any talk about that anymore."  (Vargas: Hr. 11–12).

From November 2006 until March 2007, he and Schmukler had no conversations

whatsoever about plea negotiations.  (Vargas: Hr. 12).  Similarly, they had no conversations

---

[1]  Vargas testified in Spanish at the request of his court-appointed attorney, who stated
that Vargas was able to express himself better in Spanish.  (Ricco: Hr. 167–68).

about Vargas's sentencing exposure at trial.  (<u>Id.</u>)  Vargas found out about the superseding

indictment filed against him only five minutes before the arraignment.  (<u>Id.</u>)  Schmukler never

discussed the sentence Vargas faced in connection with the superseding indictment, but Vargas

did hear this sentencing exposure discussed in open court by the judge. (Vargas: Hr. 13).

Vargas and Schmukler had conversations "about testimony, about people, the informants, about

the testimony, about some recordings that there were" prior to trial.  (<u>Id.</u>)  Schmukler provided

Vargas with copies of these recordings and discussed them with him, and reviewed Vargas's

testimony and the questions he would be asked by the prosecution.  (<u>Id.</u>)  Vargas testified that,

had the Government accepted his offer of five years, he "would have pled guilty to the five

years, with the knowledge that I was facing such a high sentence."  (Vargas: Hr. 14).

      Vargas described the fee arrangement he had with Schmukler.  He paid Schmukler

"almost $150,000," with $75,000 paid in cash for trial, $50,000 for an appeal, $5000 in cash for

a private investigator, and $10,000 in cash for "an attorney friend of his" named Todd Merer.

(Vargas: Hr. 15–17).  Additionally, Vargas paid $5000 for another attorney to represent his ex-

girlfriend, "who supposedly was going to testify against me, and that money was going to solve

that problem.  She was not going to testify if that money was paid to him."  (Vargas: Hr. 18).

Schmukler executed a lien on property owned by Vargas's mother for the fees in connection

with the appeal.  (Vargas: Hr. 19–20).  Vargas never received a receipt or signed a retainer

agreement.  (Vargas: Hr. 19).  He never met the retained private investigator and met Merer only

once.  (Vargas: Hr. 20).

      On cross-examination, Vargas testified that he completed high school in the Dominican

Republic and attended university in Santo Domingo where he studied architecture, though he did

not obtain a degree.  (Vargas: Hr. 21).  He also studied at Bronx Community College and the

New York Institute of Technology.  (Vargas: Hr. 21–22).  He owned and operated his own

business, named Gleason Realty.  (Vargas: Hr. 22).  He testified that his trial testimony was

truthful when he told the jury he was innocent, denied the charges set forth in the indictment, and

stated that he did not engage in criminal conduct.  (Vargas: Hr. 24).  When asked if he "would

have stood up, raised [his] right hand and swore to the fact that [he] was guilty in exchange for

five years," he stated that he would have because he was afraid he would be convicted at trial.

(Vargas: Hr. 25).  When asked if he spoke to Schmukler about his sentencing exposure, Vargas

stated "no," but conceded that he knew his sentencing exposure from the bail arguments.

(Vargas: Hr. 29).[2]  When confronted with a statement in his March 15, 2010 affidavit, which

stated "that counsel never discussed my testifying prior to trial," Affidavit of Caonabo Vargas in

Support of Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, dated

Mar. 15, 2010 (annexed to Pet. Mot.) ("First Vargas Aff."), ¶ 29, Vargas admitted that this

statement was "false" and "that the one who helped me did not put down what I wanted to say on

the statement, because I don't write English well, perfectly."  (Vargas: Hr. 31–32).  When asked

if he was aware that the superseding indictment increased his sentencing exposure, Vargas stated

that he did not "know the federal system."  (Vargas: Hr. 35).  He also testified that when he was

arraigned on the superseding indictment, he heard Schmukler describe a prior plea offer from the

government in open court.  (Vargas: Hr. 36).  He never asked Schmukler about this statement

and never expressed concern about this information to the Court.  (Vargas: Hr. 36–37).  Vargas

stated that Schmukler had not spoken with him about that plea offer, but that he never mentioned

---

[2]  In the bail arguments, the Government asserted that Vargas was facing a guidelines
range of eleven to thirteen years on the original indictment.  Transcript of Criminal Ca[]se for
Presentment and Arraignment, dated Jan. 19, 2006 (annexed as GX9 to 2255 Hearing: 3500
Material and Government Exhibits ("Gov. Hearing Materials")), at 6.

this fact to Schmukler.  (Vargas: Hr. 38).

Vargas admitted that he also said nothing when Schmukler mentioned a five-year plea offer at his sentencing, and that he never accused Schmukler of failing to convey a plea offer until he filed this habeas petition.  (Vargas: Hr. 39–40).  He confirmed that he had stated in his affidavit that he would have accepted an offer of "not more than five years."  (Vargas: Hr. 41).  When asked if five years was the maximum amount of time to which he would have plead guilty, Vargas responded, "I was around that, I was willing to plead to five years."  (Id.)  When the Government asked if Vargas would have accepted a six-year plea offer, Vargas responded, "It might have been that I would."  (Id.)

Vargas testified that he had spoken to Schmukler recently over the phone when Schmukler came to Fort Dix, and did not discuss at that time Schmukler's failure to inform him of an alleged five-year offer.  (Vargas: Hr. 41–42).  Vargas testified that his statement in his second affidavit, that "Schmukler never advised [him . . .] that the government had overwhelming evidence of [his] guilt," was truthful.  (Vargas: Hr. 45).

On re-direct, Vargas clarified that that statement referred to the period of time before trial, and that he realized the Government had "overwheming evidence" of his guilt after the superseding indictment was filed. (Vargas: Hr. 46-47).  He stated that when Schmukler came to Fort Dix, he asked Vargas for $15,000 to take his case to the Supreme Court, and Vargas refused.  (Vargas: Hr. 47).  When he heard Schmukler make various statements in open court about a five-year plea offer, he "wouldn't have known" if they were truthful or not, and he stated that Schmukler did not tell him one month before trial that the government had offered a plea of five years.  (Vargas: Hr. 48).  During the criminal proceedings, Vargas had spoken in court only once, when the Court asked him if he had anything to say at his sentencing.  (Vargas: Hr. 50).

16

Vargas also stated that when Schmukler came to visit him at the MDC, there were usually four

to six other people waiting to see him, and that when they spoke, they discussed his case,

Schmukler's personal life, lifestyle, and whether Vargas could get other clients for Schmukler.

(Vargas: Hr. 51–52).  He ultimately got Schmukler approximately four new clients.  (Vargas: Hr.

52).  He also elaborated on the reasons that he would have pled guilty, stating that these reasons

included "[t]he amount of time, my mother, the cost for the trial was very expensive, the savings,

the little savings my father and mother who are . . . working people, who are struggling for their

whole life, to spend them in such an expensive trial."  (Vargas: Hr. 52).

On re-cross, Vargas was asked whether he knew the cooperating witnesses, whether he

knew these individuals were criminals, and whether Schmukler informed him that these

individuals were criminals.  (Vargas: Hr. 54–55).  Vargas stated that he did not know these

witnesses had committed crimes, but that Schmukler had informed him of that before trial.

(Vargas: Hr. 54–55).  When asked what Vargas and Schmukler discussed when Schmukler came

to visit him in prison, Vargas stated that they discussed his case, but also discussed Vargas

getting Schmukler other clients and Schmukler's "houses in Long Island and all the parties that

he had and when he went out to drink."  (Vargas: Hr. 57–58).  Vargas testified that one of the

reasons he wanted to plead guilty was his sentencing exposure, and that he understood this

exposure because he had heard about it through other inmates and at his bail proceedings, but

that he had not ever discussed it with Schmukler.  (Vargas: Hr. 58–59).  When he asked

Schmukler about his sentencing exposure, "his answer was that he didn't know."  (Vargas: Hr.

59).

3.       Telesforo Del Valle's Testimony at the August 7, 2012 Evidentiary
         Hearing

Telesforo Del Valle testified at the hearing that he had been an attorney for 28 years and

that he has known Vargas for over 20 years "from the community in the Bronx."  (Del Valle: Hr.

61–62).  He stated that he represented Vargas in his criminal case after he was retained by

Vargas's father and brother.  (Del Valle: Hr. 62).  He had made numerous unsuccessful attempts

to free Vargas on bail and Vargas's family had become dissatisfied with his performance, so

they changed attorneys.  (Id.)  After Vargas's family retained Schmukler, Del Valle visited

Vargas a few times in the MCC.  (Del Valle: Hr. 63).  These visits were not in his capacity as

Vargas's attorney and were mainly because he was visiting other clients and would visit with

Vargas while he was there.  (Id.)  He remembered once visiting Vargas with Schmukler at the

MCC and said they did not discuss a plea disposition at that meeting.  (Del Valle: Hr. 63–64).

He would have remembered any discussion of a plea disposition because Vargas was an old

friend and client, and because he was "very concerned" about the case and thought "there were

serious Hobbs Act allegations in the complaint."  (Del Valle: Hr. 64).  He had no recollection of

Schmukler discussing a plea disposition with Vargas in his presence, and did not believe such a

discussion ever happened.  (Id.)

He received a call in "2010 or 2011" from Schmukler, with whom he used to share office

space, following Vargas's filing of his petition.  (Del Valle: Hr. 65–66).  In that call, Schmukler

asked him if he recalled the plea deal offered to Vargas, and Del Valle told him he did not.  (Del

Valle: Hr. 65).  Schmukler "went on to say something, I think, about three and a half years and

Mr. Vargas wouldn't take it."  (Id.)  Schmukler then asked him to sign an affidavit "indicating

that we had discussed a plea."  (Del Valle: Hr. 66).  Del Valle told Schmukler he could not do so

18

because he had no recollection of such discussion.  (Id.)  Del Valle testified that other than

discussions with the government in connection with Vargas's habeas petition, he had no other

involvement with Vargas's case.  (Del Valle: Hr. 67–68).

Schmukler never asked him to lie in an affidavit or say he was present at plea discussions

once he told Schmukler that he was not.  (Del Valle: Hr. 72–73).  Del Valle had no doubt,

however, that he never discussed a plea offer with Vargas.  (Del Valle: Hr. 74).  He was not

aware of whether Schmukler had discussed a three-year offer with Vargas outside of his

presence.  (Id.)  He attended Vargas's arraignment on the superseding indictment because

Schmukler had asked him to come along.  (Del Valle: Hr. 79).  He also stated that he visited

Vargas several times in jail, including in November 2006, and that he did not know if Schmukler

had had conversations with the Government several days prior to this visit.  (Del Valle: Hr.

78–79).  In response to the question if he "would absolutely remember if [he] had a conversation

with Mr. Schmukler in November 2006 about a potential disposition in Mr. Vargas'[s] case," he

stated that "a potential disposition . . . would only stick out if it were, in my mind, such an

incredible offer."  (Del Valle: Hr. 80).  Del Valle then testified that an offer of five or six years

would have stood out in his mind because of the government's representations as to the severity

of Vargas's case.  (Del Valle: Hr. 81).  He admitted that he never heard AUSA Loughnane's

views of the case.  (Del Valle: Hr. 83).

### 4.    Schmukler's Testimony at the August 7, 2012 Evidentiary Hearing

Schmukler testified that he received his law degree from Brooklyn Law School and

began his career as an Assistant District Attorney in the Manhattan District Attorney's Office.

(Schmukler: Hr. 85–86).  He has been practicing law for 44 years.  (Schmukler: Hr. 85).  He

handles criminal cases in New York in state and federal courts and in federal courts in a dozen

jurisdictions around the country.  (Schmukler: Hr. 86).  More than 50% of his practice is in federal district court.  (Id.)  He has never been accused of failing to convey a plea offer before and has never faced disciplinary proceedings.  (Schmukler: Hr. 86–87).  He explained that he was not Vargas's first attorney, that Del Valle represented Vargas before him, and that once he had been retained, Del Valle became less active on the case.  (Schmukler: Hr. 87).  He testified that he and Vargas were comfortable with one another, that he was putting forth his "very best effort" for Vargas, and that Vargas never asked for Del Valle to be present or to take over his case.  Id.  He represented Vargas through his superseding indictment, trial, sentencing, and appeal, and the two never had any problems communicating.  (Schmukler: Hr. 88).  After he submitted his first affidavit, he spoke with Del Valle and realized he was mistaken about Del Valle's presence when he discussed a plea offer with Vargas, but still does not recall "one way or the other."  (Schmukler: Hr. 89–93).

While he was representing Vargas prior to trial, Schmukler made an effort to secure a plea disposition for Vargas and discussed a deal with the Government.  (Schmukler: Hr. 94).  He believed these discussions were prior to the filing of the superseding indictment because the Government had told him they were unlikely to offer a plea that would result in anything less than a ten-year sentence and would file a superseding indictment if Vargas did not plead guilty.  (Schmukler: Hr. 94–95).  Schmukler could not recall the exact date of his discussions with the Government, but recalls those discussions taking place.  (Schmukler: Hr. 95).  He was then shown a copy of AUSA Loughnane's handwritten notes made "during or shortly after" a conversation with Schmukler.  (Schmukler: Hr. 96); see Affidavit of Joan Loughnane, dated Aug. 6, 2012 (annexed as Ex. 1 to Gov. Hearing Materials).  These notes read, "11/15 Made offer to Vargas/Schmukler re: getting 6 years approved.  Schmukler to call 11/21."  Affidavit of

Joan Loughnane at 2.  Schmukler testified that the notes refreshed his recollection about the timing of discussions, and he believed they were correct, but then said he could not actually recall the date of that conversation.  (Schmukler: Hr. 96–97).  He remembered seeking an offer for his client but did not recall specific discussions with AUSA Loughnane.  (Schmukler: Hr. 98).  He had been told a plea for less than ten years was unlikely, but that if it was possible, "it would maybe be a couple of years off, which I took to mean that she may indeed have said 'maybe — maybe as low as seven, but I'll have to speak to somebody about it.'  I never heard another word after that, and never got another offer after that."  (Id.)  He testified that the Government never made a five-year offer or any firm offer.  (Schmukler: Hr. 98–99).

Schmukler then had the following colloquy with the Court:

> THE COURT: Sir, if I can just ask you, since you said you didn't remember particular offers, how is it you know they didn't make a five-year offer?
> THE WITNESS: Well, I can remember what didn't happen, Judge.  That didn't happen.
> THE COURT: And you can remember it didn't happen because?  What is it about [a] five-year offer?
> THE WITNESS: A five-year offer would have been something to go back to the client with and I have a starting point now, and if I can get to the client up to something acceptable and maybe the government will come down a little bit, we'll have a deal.  But we never got past that point.

(Schmukler: Hr. 99).

Schmukler said that he made Vargas aware of his plea discussions with the Government, as is his practice.  (Schmukler: Hr. 100).  He had had this kind of discussion with Vargas on several occasions but never got Vargas to commit and "it never sounded like he was willing to accept anything over one, two or three years."  (Id.)  He testified that the two sides were far apart, "[b]ut when I felt that they were going to break down completely, I decided to go back and see Caonabo again to see if I could explain to him the government's position and see if he was willing to negotiate and accept something harsher than he was prepared to accept."  (Id.)  He

21

tried to explain to Vargas that he would have to accept "something more than he might like" to avoid a superseding indictment and trial.  (Id.)  He testified that Vargas never said he was willing to accept a five-year offer, was only willing to accept much less than that, and that the parties were very far apart in terms of reaching a deal.  (Schmukler: Hr. 101).

Schmukler was shown several attorney log books from the MDC and was asked what he discussed with Vargas when he visited him on January 3, 2007, four days before the superseding indictment against Vargas was filed.  (Schmukler: Hr. 104).  Schmukler responded, "I can only deduce.  My deduction would be that time was running out."  (Id.)  He had not been directly informed when the superseding indictment would be filed, but he had been informed that it would likely happen if he did not make an "offer" that could resolve the case under the existing indictment.  (Schmukler: Hr. 105).  He informed Vargas that the Government was likely to file a superseding indictment against him, and told him "that a direct count was going to carry a mandatory minimum far greater than what he was going to be facing if we proceeded to trial, or, rather, if we were to dispose of it on the basis of the existing indictment."  (Id.)  He also informed Vargas that there would not be a superseding indictment if there was "any hope of [a] plea here" and that Vargas would face more serious charges if he did not accept a deal. (Schmukler: Hr. 106).  No plea discussions happened after the superseding indictment was filed. (Id.)

Schmukler was then shown a transcript of Vargas's arraignment on the superseding indictment, during which he stated to Judge Marrero that AUSA Loughnane had made a "tempting offer" five or six weeks earlier.  (Schmukler: Hr. 109–12).  He testified that the Government never made a firm offer to Vargas, but at that time he had made an effort "not to characterize the government as presenting harsh terms because I wanted to keep opportunities

22

for discussion open."  (Schmukler: Hr. 112–13).  He testified that plea discussions had

definitively ended by January 11, 2007; that the Government never made a five-year offer to

Vargas; and that Vargas never asked him to make a five-year offer to the Government.

(Schmukler: Hr. 113).  In an attempt to get Vargas to agree to seven years, he told him that with

a seven-year plea, he would be released after five years.  (Schmukler: Hr. 114).

Schmukler was then shown a transcript of Vargas's sentencing, during which Schmukler

had referred to the Government "offering the defendant a plea that would have resulted in not

more than 5 years' confinement."  (Schmukler: S. Tr. 9–10).  Schmukler testified as follows with

respect to that statement:

> Well, since it had been my expectation that if they were going to make an offer
> that I could take to my client, it wasn't going to be better than seven years.  The
> only way it could ever have boiled down to five years would be if it was seven
> years and there was time off for good behavior calculated into it.  He would have
> been released in five years.  And that was accurate if he would have got seven
> years, but he never got that offer; and if he had gotten it, he wasn't going to take
> it.

(Schmukler: Hr. 115).  When asked if the Government had ever made an offer of seven years, he

stated,

> [s]even years is what could have been offered, at best, if Joan Loughnane had ever gotten
> approval.  She never got any kind of approval.  I'm not sure if she presented it or not, but
> it never got any further than the talking stage.  She let me know — she let me know what
> I could expect at best, but I don't think I ever got the formal offer.

(Schmukler: Hr. 116).  He testified that while Vargas "would have" wanted to accept a plea deal,

the amount of time he was hoping for was unrealistic.  (Schmukler: Hr. 116–17).

Schmukler denied asking Vargas for payments during his visit to Fort Dix.  (Schmukler:

Hr. 118).  He testified that it is his general practice to convey all plea offers to all clients, to

discuss the pros and cons of such offers, and to discuss clients' sentencing exposure.  (Id.)  It is

23

also his practice to discuss with all clients the charges they are facing and the risks of going to

trial.  (Schmukler: Hr. 119).  In response to a question from the Court whether Schmukler

remembered having this specific conversation with Vargas, Schmukler could recall discussions

with Vargas about his potential exposure before the superseding indictment was filed.

(Schmukler: Hr. 120).  Schmukler recalled that Vargas was aware prior to the filing of the

superseding indictment that once a drug count was included, he was exposed to "a mandatory

ten-year sentence, potential sentence of life."  (Id.)  Schmukler stated that he and Vargas

discussed the strength of the government's evidence "continually."  (Id.)  While he could not

recall specific discussions about this topic, he testified that "I just know that you can't represent

somebody and not have those discussions continually."  (Schmukler: Hr. 120–21).

Schmukler stated that he could not recall receiving an offer with a specific number from

the Government at any point.  (Schmukler: Hr. 100–01, 125).  On cross-examination, he

admitted that when he made the statement of a five-year offer at sentencing, it was not accurate,

and that he was "trying to coax the judge into giving [Vargas] less than what otherwise be [sic]

called for."  (Schmukler: Hr. 126–30).  He also conceded that the statement in his second

affidavit — that the best offer Vargas received was 78 months — was also not correct.

(Schmukler: Hr. 132).  He again stated that the only number he ever heard from the Government,

which he described as an offer of not "anything better than seven" years, was contingent on the

approval of Government supervisors.  (Schmukler: Hr. 133–34).  He was told that there would be

no better offer, and he never heard back about that number.  (Schmukler: Hr. 133).  He was not

surprised when he did not hear back from the Government about this number, because they were

"not offering any particular hope."  (Schmukler: Hr. 134).  He testified that Vargas would have

accepted something between one and three years.  (Schmukler: Hr. 135).  He elaborated that the

government was not willing to consider that seriously, and that "I needed to hear an offer from them.  They didn't need to hear an offer from me."  (Id.)  He conceded that he never proposed a three-year plea deal to the Government.  (Schmukler: Hr. 135–36).  He did not recall having a specific discussion with Vargas about the fact that Vargas was facing 141 to 155 months' imprisonment.  (Schmukler: Hr. 138).

He stated that the signature on his first affidavit was not his own, but that he must have authorized someone to sign it for him.  (Schmukler: Hr. 141).  While this affidavit referred to a plea offer of 60 months, see First Schmukler Aff. ¶ 8, Schmukler testified that he did not know what plea offer this affidavit was referring to.  (Schmukler: Hr. 143).  He did not recall his phone conversation with Del Valle after Vargas filed a habeas petition, but stated that he "would never" have asked Del Valle to submit an affidavit about "whether a plea offer was made of three years" because "[t]hat never happened."  (Schmukler: Hr. 145–46).  He testified that he turned over all files from Vargas's case to Vargas's family members.  (Schmukler: Hr. 147–48).  He could not recall the total amount of money he received for Vargas's trial and appeal and had no recollection of Vargas signing a written retainer agreement, but remembered drafting "some document" about payment and discussing their agreement.  (Schmukler: Hr. 149–50).  He could not recall whether at that time he was aware of the requirement that attorneys execute retainer agreements or letters of engagement.  (Schmukler: Hr. 150–51).  He stated that everyone who pays money at his office receives a receipt, but he did not have a copy of any such receipt in Vargas's case.  (Schmukler: Hr. 151).  He had no recollection of having Vargas's mother execute a lien on her property to pay him for the appeal, but after he was shown documents relating to this lien, he conceded that this had occurred.  (Schmukler: Hr. 151–54).  He testified that he did not hire a private investigator, but when presented with his first affidavit which included a

statement that he had hired an investigator, he stated that he did.  (Schmukler: Hr. 154–55).  He

also testified that he did not receive any of the money paid for Todd Merer's services.

(Schmukler: Hr. 155–56).

On re-direct, Schmukler stated that he drafted his first affidavit very quickly and

submitted the second one with an effort to be as accurate as possible.  (Schmukler: Hr. 156–57).

He stated that the plea discussions took place six years ago, and since then he has had 30 to 40

active cases at any given time.  (Schmukler: Hr. 157).  He could not recall an "exact number" of

years discussed with the Government in Vargas's case, but testified that there was no specific

number because no number was low enough for Vargas to accept, as Vargas was "completely

unreasonable."  (Schmukler: Hr. 158).  Schmukler stated that he would have recommended that

Vargas accept an offer of five years, had such an offer been made, because he "knew the

potential penalties were going to be significantly more severe," but that the only thing Vargas

ever committed to was "something like one, two or three years."  (Schmukler: Hr. 159).  On re-

cross, Schmukler stated that he did communicate his client's desire to plead guilty to the

Government, but that he did not recall requesting a Pimentel letter from the Government.

(Schmukler: Hr. 162–63).

D.    Additional Affidavits

Following the evidentiary hearing, the Government submitted two affidavits from the

AUSAs involved in the case as had been contemplated at the hearing.  (Hr. 165–66).  AUSA

Loughnane submitted an affidavit explaining the notes from her conversation with Schmukler on

November 15, 2006, which had been presented at the August 7 hearing.  See Affidavit of Joan

Loughnane, dated Sept. 14, 2012 (annexed as GX A to Memorandum of Law in Opposition to

Petitioner Caonabo Vargas's Claim That He Received Ineffective Assistance of Counsel with

26

Respect to a Plea Offer, dated Oct. 5, 2012 (Docket # 38) ("Gov. Mem.")).  She stated that she
believes the notes accurately reflect her conversation with Schmukler, specifically the fact that
they discussed the possibility of her obtaining approval for a six-year deal.  Id. ¶ 3.  She could
not recall a specific discussion about that offer after this call, but she stated that she understood
Vargas was not interested in the terms she had discussed with Schmukler.  Id. ¶ 4.  Because of
the potential sentence involved with the crimes in the original indictment, she did not believe the
Government would have extended a five-year offer.  Id. ¶ 5.  Based on the facts of Vargas's case,
she believed that a plea would have been in the range of 78 to 97 months, which exceeds five
years, and that the mandatory minimum sentence for the firearms offense was seven years of
incarceration.  Id. ¶ 6.

        In addition, AUSA Laurie Korenbaum submitted an affidavit.  See Affidavit of Laurie
Korenbaum, dated Sept. 17, 2012 (annexed as GX B to Gov. Mem.).  She was assigned to work
as a prosecutor on Vargas's case beginning in January 2007, when AUSA Loughnane was
already on the case and the Government was about to file the superseding indictment.  Id. ¶ 3.
When she came on the case, she was told that plea discussions had been unsuccessful.  Id. ¶ 4.
She remembered a phone call among AUSA Loughnane, Schmukler, and herself in January
2007, when the Government informed Schmukler of their intent to file a superseding indictment,
and Schmukler indicated to them that Vargas wanted to proceed to trial.  Id.  She stated that the
superseding indictment was intended to strengthen the case and that after it was filed, the
Government was focused on preparing the case for trial.  Id. ¶ 5.  She stated that she was "certain
that [she] was never told that a firm plea offer had been extended to Mr. Vargas, much less a
five-year plea offer."  Id. ¶ 6.  She does not remember the Chief of the Violent Crimes Unit at
that time ever approving a plea offer for Vargas, about which she would have been informed had

it happened.  Id.  She also stated that because of the potential sentence involved in the crimes charged in the original indictment, she did not believe the Government would have extended a five-year plea offer to Vargas.  Id. ¶ 7.  She also believed that any plea would have been within the range of 78 to 97 months, which exceeds five years, and that the mandatory minimum sentence for the firearms offense would be seven years of incarceration.  Id. ¶ 8.

E.      Post-Hearing Briefing

On October 5, 2012, the Government filed its brief in opposition to Vargas's remaining claims.  See Gov. Mem.  Also on October 5, Vargas filed a brief in support of his claim of ineffective assistance of counsel.  See Find[ings] of Fact & Conclusions of Law, filed Oct. 5, 2012 (Docket # 37) ("Pet. Br.").  On October 28, 2012, the Government filed a reply brief.  See Government's Reply Memorandum of Law in Opposition to Petitioner Caonabo Vargas's Claim That He Received Ineffective Assistance of Counsel with Respect to a Plea Offer, filed Oct. 28, 2012 (Docket # 43).  Petitioner submitted a reply on November 20, 2012.  Reply Declaration, filed Nov. 20, 2012 (Docket # 45) ("Vargas Post-Hearing Reply").

II.     APPLICABLE LEGAL PRINCIPLES

A.      Law Governing Petitions Under 28 U.S.C. § 2255

28 U.S.C. § 2255(a) provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Id.  Relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice."  Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (per curiam) (citation and internal quotation marks omitted).  "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack."  Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (citations and internal quotation marks omitted).

It is well established that § 2255 "may not be employed to relitigate questions which were raised and considered on direct appeal."  Barton v. United States, 791 F.2d 265, 267 (2d Cir. 1986) (per curiam); accord United States v. Sanin, 252 F.3d 79, 83 (2d Cir.) (per curiam) (citing cases), cert. denied, 534 U.S. 1008 (2001).  "'Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal.'"  Sanin, 252 F.3d at 83 (quoting Chin v. United States, 622 F.2d 1090, 1092 (2d Cir. 1980), cert. denied, 450 U.S. 923 (1981)); see also United States v. Frady, 456 U.S. 152, 164–65 (1982) ("Once the defendant's chance to appeal has been waived or exhausted . . . we are entitled to presume he stands fairly and finally convicted, especially when . . . he already has had a fair opportunity to present his federal claims to a federal forum. . . .  [A] final judgment commands respect.").

"The petitioner in a § 2255 proceeding bears the burden of proof by a preponderance of the evidence."  Feliz v. United States, 2002 WL 1964347, at *4 (S.D.N.Y. Aug. 22, 2002) (citing Triana v. United States, 205 F.3d 36, 40 (2d Cir.), cert. denied, 531 U.S. 956 (2000)); Harned v.

Henderson, 588 F.2d 12, 22 (2d Cir. 1978) ("It is, of course, well settled that in federal habeas corpus proceedings the burden of proving a constitutional claim lies with the petitioner and that the nature of that burden is the customary civil one of a preponderance of the evidence.").

      B.      Law Governing Ineffective Assistance of Counsel Claims

"In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness;' and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong — whether counsel's performance fell below an objective standard of reasonableness — "'[j]udicial scrutiny . . . must be highly deferential'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (alteration in original) (quoting Strickland, 466 U.S. at 689); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence).  In the context of plea discussions, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," and failure to do so constitutes ineffective assistance of counsel.  Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012).  This includes the duty to advise a client of the strength of the prosecution's case and the client's relevant sentencing exposure.  See Purdy v. United States, 208 F.3d 41, 45 (2d

Cir. 2000).

To establish prejudice in the context of an attorney's failure to convey a plea offer, the Supreme Court requires a petitioner to show "a reasonable probability [petitioner] would have accepted the earlier plea offer," "a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it," and "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Frye, 132 S. Ct. at 1409; accord Patterson v. United States, 2012 WL 3866489, at *5 (S.D.N.Y. Sept. 6, 2012). This first prong — whether petitioner would have accepted the earlier plea offer — can be shown "through the petitioner's own sworn statement if it is credible in light of all the relevant circumstances." Puglisi v. United States, 586 F.3d 209, 215 (2d Cir. 2009). Such statement must also be accompanied by objective evidence. See Raysor v. United States, 647 F.3d 491, 495–96 (2d Cir. 2011) (noting that a large sentencing disparity between the lapsed plea offer and what the petitioner ultimately received constitutes such objective evidence) (citing and comparing cases). However, a petitioner's frequent proclamations of innocence will undermine such a claim. See Cullen v. United States, 194 F.3d 401, 407 (2d Cir. 1999); accord Patterson, 2012 WL 3866489, at *5–6.

III.   DISCUSSION

In his post-hearing brief in support of his claim of ineffective assistance of counsel, Vargas implicitly accepts as he must that there was no plea offer of five years. Instead, he argues that there was a plea offer of six years and that Schmukler failed to convey it to him, and that he also failed to convey Vargas's sentencing exposure in the absence of a plea. See Pet. Br. at 7–10, 31–34; Reply at 4–5. Additionally, he argues that he meets the prejudice prong of

Strickland because had he been represented by effective counsel, a satisfactory plea agreement would have been reached through negotiations.  See Pet. Br. at 23, 34–38.  The Government, in opposition, argues that Schmukler adequately advised Vargas throughout plea negotiations, and that Vargas cannot show prejudice because no firm offer was ever made, and Vargas would not have accepted even the six-year offer reflected in AUSA Loughnane's notes.  Gov. Mem. at 8–24.

     A.     <u>Credibility Findings</u>

We turn first to the question of the credibility of the witnesses.  We have reservations about the accuracy of the testimony of Schmukler because he has presented multiple sworn statements to the Court that were inaccurate.  Schmukler provided an affidavit that referred to a "60 month" plea offer by the Government, First Schmukler Aff. ¶ 8, and then an affidavit that referred to a "78 month" plea offer by the Government, Second Schmukler Aff. ¶ 5.  He ultimately conceded at the hearing, however, that neither of these statements was true. (Schmukler: Hr. 126, 132).

At the hearing, he testified unequivocally that he never hired a private investigator but then, when shown his own prior sworn statement to the contrary, conceded that in fact he had hired such an investigator.  (Schmukler: Hr. 154–55).  He also submitted an affidavit that described Del Valle being present when a plea offer was presented to Vargas.  First Schmukler Aff. ¶ 8.  But Del Valle credibly testified he was never present when any plea offer was made. (Del Valle: Hr. 74–75).

We do not, however, reject all of Schmukler's testimony.  For example, we credit his testimony about his work preparing Vargas for trial because he has consistently attested to these facts and, as described below, Vargas conceded that several of his own claims to the contrary

were false.  (Vargas: Hr. 31–32, 45–46).  We also credit Schmukler's assertions that Vargas was never interested in pleading to a charge unless the plea would have resulted in less than a five year sentence (Schmukler: Hr. 100, 135), based on our evaluation of the credibility of Vargas's testimony.

The Court does not accept Vargas's testimony in full for several reasons.  First, Vargas stated in a sworn affidavit that he spoke "little to no" English and that Schmukler was aware of this.  See Third Vargas Aff. ¶¶ 3–4.  But Vargas testified at his trial for many hours in English. (Vargas: Hr. 23, 56; see also Ricco: Hr. 167 (counsel had two meetings with Vargas exclusively in English)), and actually attended college in the United States (Vargas: Hr. 22).  Vargas also claimed that Schmukler "never discussed my testifying prior to trial."  First Vargas Aff. ¶ 29. But Vargas admitted at the hearing that he discussed his testimony with Schmukler (Vargas: Hr. 14), and then ultimately admitted that his statement to the contrary was false (Vargas: Hr. 31–32).  Because of his completion of extensive college coursework in the United States (Vargas: Hr. 22), the Court does not credit Vargas's explanation that the statement in his first affidavit came about because "the one who helped me did not put down what I wanted to say on the statement, because I don't write English well, perfectly," (Vargas: Hr. 32).

More critical to the issues in this case, we reject out of hand Vargas's testimony that he "might have" pled guilty to a plea offer of six years (Vargas: Hr. 41) as it contradicts numerous statements made in his affidavits.  Nor do we believe that he would have taken an offer of even five years.  (Id.)  As Vargas himself noted in his petition, Schmukler had claimed at the sentencing that there had been a plea offer by the Government of "not more than five years." Pet. Mot. at 4.  But if Vargas had truly harbored a desire to plead guilty in exchange for a five-year sentence, the Court believes that he would have taken some action to determine why he

33

had not been permitted to take such a plea.  Yet there is no evidence that Vargas ever complained about this alleged failure to anyone, including Schmukler, until he filed his petition. Indeed, in contravention of what would be expected behavior by someone whose attorney had failed to convey a plea offer they would have been willing to accept, Vargas actually retained Schmukler to represent him on appeal.  (Vargas: Hr. 40).  Vargas's testimony that he never complained to Schmukler after the arraignment "that [Schmukler] had not in fact spoken with [Vargas] about a government plea offer" (Hr. 38) makes sense only if Vargas knew that Schmukler had discussed with him the range of years for which he was willing to plead guilty, as Schmukler testified (Schmukler: Hr. 100, 135; see also Schmukler: Hr. 118), and Vargas was not interested in any purported plea that involved a five-year sentence.  Thus, we credit Schmukler's assertions that Vargas had expressed interest in a plea that would result in a sentence in the range of one to three years (Schmukler: Hr. 100, 135, 159), but not for more.  Vargas's claim in his petition that he was interested in a five-year plea deal likely came about because Schmukler at sentencing referred — albeit erroneously — to such an offer.

B.    Merits of the Ineffective Assistance of Counsel Claim

We begin by noting that the content of the discussions between Schmukler and Vargas are disputed.  But the Court does not find it necessary to making findings with respect to all contested aspects of these discussions.  One question of importance, however, is whether the Government was prepared to offer Vargas a plea deal.  At the evidentiary hearing, both sides asked numerous questions relating to a five-year plea offer (see, e.g., Hr. 25, 37, 39, 99, 113), presumably because of the statements made by Schmukler at Vargas's sentencing.  However, no party testified that a five-year offer had been made, and Schmukler admitted that his reference to five years at Vargas's sentencing was false.  (Schmukler: Hr. 116, 130).  Therefore, we find that

34

no five-year offer was ever made.

Instead, we conclude that AUSA Loughnane discussed with Schmukler the possibility of a guilty plea that would result in a six-year sentence. We base this finding on the affidavit of AUSA Loughnane and her contemporaneous notes. Additionally, we credit the affidavits from the AUSAs to the extent they state that had Schmukler proposed a five-year deal, it would never have been approved. See Affidavit of Joan Loughnane ¶ 5; Affidavit of Laurie Korenbaum ¶ 7.

As to whether Schmukler disclosed to Vargas the AUSA's discussion of a possible six-year offer, we elect not to reach the question. The Supreme Court has made clear that a district court considering a habeas corpus petition alleging ineffective assistance of counsel need not reach the issue of whether counsel's performance was deficient if the petition can be resolved through an examination of "the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697; accord Farrington v. Senkowski, 214 F.3d 237, 242 (2d Cir. 2000) (resolving ineffective assistance claim based on prejudice prong alone); Leano v. United States, 2010 WL 3516221, at *5 (E.D.N.Y. Aug. 31, 2010) (quoting Strickland, 466 U.S. at 697) ("[F]ederal district courts need not address both components if a petitioner fails to establish either one.").

Turning to the question of whether Vargas has shown prejudice, we reiterate that Vargas has the burden of showing "a reasonable probability [he] would have accepted the . . . plea offer," "a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it," and "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Frye, 132 S. Ct. at 1409. Here, Vargas has not demonstrated a "reasonable probability" that he would have accepted a six-year plea deal or that

35

he would have changed his views on pleading had he been informed of it.  The evidence on the question of what Vargas would have accepted in terms of a plea strongly indicates that Vargas had no interest in pleading guilty before trial if the plea would have resulted in a sentence of even as much as five years.  Instead, as Schmukler repeatedly testified (Schmukler: Hr. 100, 159), Vargas was only interested in a deal of at most three years.  For the reasons stated above, we have credited this testimony.  We thus do not find that Vargas would have accepted even a six-year plea offer from the Government.[3]

Vargas's claim of prejudice is further undermined by the fact that he asserted his innocence through his trial and sentencing, and continued to proclaim innocence at the evidentiary hearing.  (Vargas: Hr. 24–25; Vargas: S. Tr. 11 ("I never committed any crime . . . .")).  Such a continued insistence upon innocence undermines his claim that he would have accepted any plea deal.  See, e.g., Zandi v. United States, 460 F. App'x 51, 53 (2d Cir. 2012); Cullen, 194 F.3d at 407 ("[I]nsistence on [petitioner's] innocence is a factor relevant to any conclusion as to whether he has shown a reasonable probability that he would have pled guilty.").

Vargas argues that "there is strong evidence to support Caonabo Vargas' claim that he

---

[3]  We note that the petition would fail even in the absence of our crediting Schmukler's testimony on this point because Vargas himself — at a time when he thought there had been a plea offer from the Government of five years — stated in his own affidavit that he would have pled guilty to a deal of "not more than" five years.  Second Vargas Aff. ¶¶ 29, 38.  Similarly, his mother stated in an affidavit that he told her at the time he would have pled guilty to "five years," see Affidavit of Lourdes Cortes Roman ¶¶ 4–7.  Vargas confirmed at the hearing that he would have pled guilty to an offer of "five years or less." (Vargas: Hr. 14).  When specifically asked at the hearing whether he would have accepted a six-year plea offer, Vargas gave only an ambiguous and conclusory response (Vargas: Hr. 41) ("It might have been that I would."), which we do not credit.  Given that Vargas was interested in a maximum of five years, there would have been no plea possible because the Government would not have offered a deal involving a five-year sentence.

would have pled guilty in this case had he been represented by an effective attorney during these critical stages. . . .  Effective counsel . . . would have recognized that the 6 year offer was close in time to the interests of the defendant who wanted to avoid trial, and effective counsel would have worked hard to go from 'plea proposal' to 'plea agreement.'"  Pet. Br. at 36–37. Essentially, Vargas argues that an effective attorney would have convinced him to pursue approval of the six-year proposal.  But there is simply no evidence — other than pure speculation — to suggest that Vargas was prepared to accept a plea offer of six years.  Vargas argues that he "suffered prejudice because he was denied an opportunity to hear the government's offer  [of six years] . . . in order to make an intelligent decision."  Vargas Post-Hearing Reply at 5; id. at 12–13 ("[I]t is reasonable to conclude that had the [six-year] offer and counteroffer been effectively communicated by attorney Schmukler there is a likely probability that an agreement could have [been] reached in this case.").  But assuming arguendo that Schmukler failed to convey to Vargas the Government's discussion of a potential six-year deal, the Court finds that this occurred only because of Vargas's categorical insistence that he was not interested in an offer that carried such a sentence and thus that the communication of the proposal to Vargas would not have changed his mind.  It is pure speculation to imagine that Vargas, having drawn the line at a sentence of up to three years, would have been swayed by learning that the Government was willing to pursue discussions about a six-year sentence.  In other words, Vargas has not "affirmatively prove[d]," Strickland, 466 U.S. at 693, that learning of the possibility of a six-year deal would have changed his mind.  See Rosario-Dominguez v. United States, 353 F. Supp. 2d 500, 521 (S.D.N.Y. 2005) (rejecting argument that petitioner was prejudiced by failure to convey plea because petitioner "'would have been in a better position to weigh in on his options'" had he been told of plea offer); United States v. Perez-Gomez, 2003

WL 22119123, at *5–7 (D. Conn. Aug. 29, 2003) (same).

To the extent Vargas is arguing that Schmukler should have made greater efforts to obtain a plea offer from the Government involving a sentence of less than six years, see Pet. Br. at 37 ("[E]ffective counsel would have worked hard to go from 'plea proposal' to 'plea agreement.'"), the evidence is uncontroverted that the Government would not have made a lesser offer — and certainly not one for five years, the only one that even Vargas has asserted he would have taken.  Affidavit of Joan Loughnane ¶ 5; Affidavit of Laurie Korenbaum ¶ 7.  Indeed, it appears that the "6-year" deal could only have been a 6-1/2 year deal inasmuch as the guidelines range would have called for a sentence of 78 months or more.  Affidavit of Joan Loughnane ¶ 6; Affidavit of Laurie Korenbaum ¶ 8.  Because the Court finds that the Government would not have offered anything less than a six-year sentence, and because Vargas would not have taken any deal the Government might have offered, he cannot prove prejudice.  See Ferreiras v. United States, 895 F. Supp. 2d 504, 512 (E.D.N.Y. 2012) (where petitioner made no showing that deal would have been available to petitioner, in face of prosecution's contentions that deal was never offered, petitioner's claims of prejudice failed); Williams v. United States, 2012 WL 1116403, at *11 (E.D.N.Y. Mar. 30, 2012) ("[Petitioner] has failed to make the requisite threshold showing, i.e., that there is a reasonable probability that, but for the actions of counsel of which he complains, the hypothetical plea would have materialized into a formal offer" and pointing to the Government's argument for an upward departure at sentencing in support); accord Jordan v. United States, 2012 WL 5304176, at *11 (E.D. Tenn. Oct. 25, 2012) (no prejudice where there was no showing that government would have agreed to sentence to which petitioner later said he would have plead guilty).

Insofar as Vargas argues that he was not adequately advised by Schmukler about his

sentencing exposure in order to make an intelligent decision about how many years he was willing to take, the Court does not credit Vargas's conclusory assertions that Schmukler never discussed the potential sentencing consequences if he went to trial rather than pleading guilty. (Hr. 12, 13). His only detailed testimony on this topic during cross-examination was wholly incredible: that when he asked Schmukler his sentencing exposure, Schmukler's "answer was that he didn't know." (Vargas: Hr. 59). We credit instead Schmukler's testimony that it was his practice to provide this information regardless of whether there was a plea offer (Schmukler: Hr. 118–19), and that he did so in this case in a manner sufficient to accurately inform Vargas that he faced a significant sentencing exposure if he went to trial (Schmukler: Hr. 105, 120, 124). Additionally, the Court finds that there would have been no prejudice from any failure of Schmukler with respect to his discussions about Vargas's sentencing exposure because, as Vargas testified, he knew about the "high" sentence (Vargas: Hr. 14) he faced from statements made in court at his bail hearing and from other sources (Vargas: Hr. 13, 14–15, 26–27, 29).[4]

In sum, because Vargas has not met his burden of showing that he would have accepted any plea offer that was made or could have been made by the Government, he has failed to show any prejudice. Thus, his claim for ineffective assistance of counsel must fail.

---

[4] To the extent that Vargas's ineffective assistance claim rested in part on Schmukler's failure to prepare him adequately for trial or advise him about the strength of the case against him, this claim is rejected. Vargas conceded that several of these allegations were false (Vargas: Hr. 31–32), the Government provided evidence that these claims were false (Vargas: Hr. 31–32, 37), and Schmukler's testimony as to these preparations was credible (Schmukler: Hr. 87, 109, 118–121, 123–24). The Court believes Vargas, as an intelligent person, knew of the risks of going to trial and did not make his decisions about pleading simply because, as Vargas claimed, Schmukler "assured [him] that [he] was going to win." (Vargas: Hr. 55).

IV.    CONCLUSION

For the foregoing reasons, Vargas's motion to vacate his conviction is denied.   The

Clerk is requested to enter judgment and to close this case.

Dated: June 27, 2013
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge